## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**MELISSA HIGNELL, ET AL.**                      CIVIL ACTION

**VERSUS**                                       NO. 19-13773
                                                 C/W: 22-2991; 23-5000
                                                 RELATED TO: ALL

**CITY OF NEW ORLEANS**                          SECTION "B"(1)

## OPINION

Before the Court are cross-motions for summary judgment along with responsive memoranda filed by the following parties:

A. Plaintiffs, Samantha Hignell-Stark, White Spider Rental Concierge, L.L.C., Garrett Majoue, Zachary Bennett, Russell Frank, Samantha McRaney, Bob McRaney, Jimmie Taylor, Summit Nola III, LLC, and Kurt Klebe (collectively, "Hignell plaintiffs") (Rec. Doc. 170), **and** defendant, the City of New Orleans ("the City") (Rec. Doc. 172). Both motions are opposed (Rec. Docs. 178, 183, 234). Further, Hignell plaintiffs (Rec. Docs. 179, 184, 206, 211, 225, 239) and the City (Rec. Docs. 185, 205, 226) filed replies in support, as well as supplemental material.

B. Newly consolidated plaintiff, Tina Marquardt ("Marquardt") (Rec. Doc. 228), **and** the City (Rec. Doc. 227). Both motions are opposed (Rec. Docs. 235, 236). Further, Marquardt filed supplemental memoranda (Rec. Docs. 244, 250) in support of her motion.

Hearings on the motions were held on November 8, 2023 and December 20, 2023, with parties' counsels in attendance. In addition to oral reasons given during the hearings, the following additional reasons are given, along with related orders.

## I.    FACTS AND PROCEDURAL HISTORY[1]

---

[1] The first four paragraphs of this section are taken in substantial measure from *Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 326 (5th Cir. 2022), the appellate opinion authored by Circuit Judge Jerry E. Smith.

This case involves a litany of challenges to the constitutionality of City ordinances concerning short term rentals ("STRs")—known to most readers as the type of popular home lodging offered on internet platforms like Airbnb and Vrbo, but specifically defined as the "use and enjoyment by guests of a Dwelling Unit,[2] or any portion thereof, for a period of less than thirty (30) consecutive days[.]" New Orleans CZO art. 26, § 26.6 (Supp. No. 106, Update 1).

Prior to 2017, it was illegal for property owners to rent their homes for less than thirty days (or for less than sixty days in the French Quarter). Following a New Orleans City Planning Commission ("CPC") study that began in 2016, however, the City decided to offer permits for such property owners to do so effective April 1, 2017. The initial permitting regime (and subsequent ideations) made clear that an STR permit was "a privilege, not a right." It provided that the City "may issue" an STR permit, even to an applicant who met all the statutory requirements for one. STR permits also expired after one year. The initial and current permitting regimes also assured that "[r]enewal permits shall be issued (obtained) in the same (or substantially similar form and) manner as initial permits." But that promise was made subject to the limitation on issuing permits in the first place. Notably, the current regime at issue also established a so-called "lottery/equitable system" for only one STR or Bed and Breakfast ("B&B") permit within a city square, described as all lots fronting the boundary of a city block inclusive of all interior lots. *See* New Orleans City Code ("CC") § 617(g); CZO § 21.8.C.18(l)–(q). However, "[a]ny property owner may request a special exception from an applicable block limitation, provided no more than two (2) special exceptions may be in effect within any block at one time." *See* CZO § 21.8.C.18(r).

---

[2] A "Dwelling Unit" is a "room, or group of rooms, providing complete, independent living facilities, including permanent provisions for living, sleeping, eating, cooking, and sanitation for one or more persons." New Orleans Comprehensive Zoning Ordinance ("CZO") art. 26, § 26.6 (Supp. No. 106, Update 1).

One year into the initial regime, the City commissioned a study from its Planning Commission to reevaluate the City's regulation of STRs. The 2018 study found that the rapid proliferation of STRs had brought nuisances to the City.[3] Specifically, it discovered that STRs in residential neighborhoods had lowered residents' quality of life. Many visitors to the City who stayed in STRs were loud and did not clean up after themselves. The study also determined that the expansion of STRs into residential neighborhoods had led to a "loss of neighborhood character." And it collected anecdotal evidence that the STR market had made housing less affordable for residents. Because of the study and other efforts to examine the STR market, the City substantially revised its regulation of STRs in 2019. The 2019 revisions led to litigation against the City.

In November of 2019, Hignell plaintiffs, a group of property owners who wished to obtain STR permits, sued the City alleging constitutional violations under 42 U.S.C. § 1983. Among other restrictions, the 2019 STR regulations imposed a residency requirement for STRs in residential neighborhoods: a homeowner could only obtain an STR permit for their primary residence. To enforce this residency requirement, the City required applicants to show they had a homestead exemption—which under Louisiana law, is only given to homeowners for their principal residence—for the property they were seeking a permit for.

This Court found Hignell plaintiffs were successful on a First Amendment claim regarding prior restraint in the 2019 STR regulation at Ordinance M.C.S. 28,157, § 26-625(a), but unsuccessful on all other challenges, including those asserted under the Takings Clause and Commerce Clause of the U.S. Constitution. See *Hignell v. City of New Orleans*, 476 F. Supp. 3d 369 (E.D. La. 2020) (Order and Reasons dismissing First Amendment freedom of association,

---

[3] *See* Rec. Docs. 48-6 and 48-7.

assembly, and content restrictions claims, Fifth Amendment takings claim, Fourth Amendment due process claims, Eighth Amendment excessive fines claims, and Dormant Commerce Clause claims); *Hignell,* 2021 WL 2886213 (E.D. La. July 9, 2021) (Opinion finding viability in the First Amendment prior restraint claim and finding disclosure requirements reasonably related to valid interest); and *Hignell*, 2021 WL 4168392 (E.D. La. Sept. 14, 2021) (ordering entry of final judgment on all but prior restraint claim).

In August 2022, the Fifth Circuit affirmed this Court's findings dismissing Hignell plaintiffs' Takings Clause claim but vacating that part relative to the Commerce Clause. *Hignell-Stark v. City of New Orleans*, 46 F.4th 317 (5th Cir. 2022). It also dismissed for lack of jurisdiction the City's cross-appeal, requesting review of the First Amendment decision on prior restraint. Citing 28 U.S.C. § 1291, *Sullivan v. Finkelstein*, 496 U.S. 617, 628 n.7 (1990), and *Gelboim v. Bank of Am. Corp.,* 574 U.S. 405, 408–09 (2015), the panel found the decision on the latter claim did not resolve the request for a declaration or a permanent injunction and remanded for further proceedings.

In rejecting plaintiffs' Takings Clause claim and after noting that the City ordinance expressly declared an STR permit "a privilege, not a right," the circuit opinion stated "plaintiffs thus lacked the sort of ownership in their STR licenses that could support a 'legitimate claim of entitlement' to damages when licenses were not renewed" and the plaintiffs' interest in licenses "were not so longstanding that they can plausibly claim custom had elevated them [STR licenses] to property interests." *Hignell-Stark*, 46 F.4th at 324–25 (quoting *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 270 (5th Cir. 2012) (further citation omitted)).

Regarding the Commerce Clause, the circuit agreed with this Court insofar as the owner-residency requirement was found facially discriminatory against out-of-state property owners

because it forbade them from competing in the City's STR market. *Id*. at 326. However, the panel rejected our application of the test in *Pike v. Bruce Church, Inc*. 397 U.S. 137, 142 (1970) (An incidental burden on interstate commerce "will be upheld unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits."). *Hignell-Stark,* 46 F.4th at 328. While determining the City's purposes for imposing the residency requirement—preventing nuisances, promoting affordable housing, and protecting the residential character of neighborhoods—were legitimate purposes, the panel found the residency requirement failed because there were available alternative methods for achieving those legitimate policy goals. *Id.* at 328–29. Yet, said the circuit, the City chose the option (i.e., the owner-residency requirement) that "the Constitution forbids." *Id*. at 329.

In illustrating many specific nondiscriminatory alternatives for achieving such purposes, the circuit opinion instructed that the City could adopt measures "to **step up its enforcement efforts**, increasing the chance that owners face punishment for disorderly guests and strengthening their incentive to monitor their rentals. It could also **increase the magnitude of penalties** it imposes on owners for guests who violate quality-of-life regulations. That would similarly give owners stronger incentives to prevent nuisances and help to fund increased enforcement. The City could even **strip repeat offenders of their STR licenses**, thus eliminating the STRs most likely to negatively impact their neighbors." *Id.* at 328 (emphasis added). Examples of several options beyond enforcement were also given in the circuit opinion, such as "**increas[ing] taxes** on STRs . . . [to] discourage younger—and rowdier—guests from renting them and provide additional funds that could also be used to mitigate nuisances." *Id*. (emphasis added). And, said the circuit, another option would be to "give STR owners the alternative of **having** an **operator** stay on the property during the night—thus acting as the 'adult supervision' that the City ostensibly hopes live-in

owners will provide." *Id*. (emphasis added). The circuit opinion also stated "the City could reduce the demand for housing in other ways, such as **increasing the price of an STR license** for owners or **capping the number of licenses available for any given neighborhood**." *Id*. (emphasis added). The circuit finally stated "if the City is serious about protecting affordable housing, there's an obvious alternative to reducing demand: **increasing supply**. The City could **eliminate price controls, reduce housing regulations, and provide additional incentives for homebuilders to construct more housing**." *Id*. (emphasis added).

Following the Fifth Circuit's decision in *Hignell-Stark*, and directives from this Court, the City began the process of, yet again, revising its STR regulations. After having its Planning Commission conduct another study, holding multiple public hearings, and making other efforts to examine the STR market, the City adopted two ordinances: Ordinance No. 29381, which amends the New Orleans CC, and Ordinance 29382, which amends the CZO. The ordinances deleted the owner-residency requirement, added an operator requirement, limited the number of STRs in a neighborhood, and provided other changes mentioned by the Fifth Circuit as nondiscriminatory alternatives in addressing legitimate purposes.

Hignell plaintiffs amended their complaint (Rec. Doc. 160) to challenge those ordinances, including the foregoing additions, on a variety of arguments. They also present in their summary judgment motion new challenges, including an attack upon the City's general authority to "zone the *duration* of residential use of residential private property . . . ." *See* Rec. Doc. 170-1 at 2 (emphasis theirs).[4]

---

[4] Hignell plaintiffs correctly note that "[t]he City admits that the facts in this case are not in dispute. Plaintiffs agree. But we do not agree that the City is entitled to summary judgment. To the contrary, it is Plaintiffs who are entitled to summary judgment on this record." *See* Rec. Doc. 178 at 9 (Hignell plaintiffs' opposition).

Plaintiff Marquardt and the City seek summary judgment against each other relative to Marquardt's claim that her STR permit was revoked in violation of property rights under the Due Process Clause of the Fourteenth Amendment. Basically, Marquardt argues the City effectively cancelled her permit prior to its expiration date when the City awarded an exclusive permit to another STR applicant via its newly instituted "lottery" system. The City contends it was operating under a "sunset provision" pursuant to a new permitting scheme and, regardless, it "has not taken any action against them to prevent them from operating." *See* Rec. Doc. 241 at 10 ll. 9–16; Rec. Doc. 225-2 ("Non-Commercial Short-Term Rental Interim Zoning District (IZD)").  Both parties have filed competing responsive memoranda and supportive documentation.

## II.    LEGAL STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 247 (1986). The "governing substantive law [identifies] which facts are material" and a "genuine dispute" exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" at trial. *Anderson*, 477 U.S. at 248. In assessing whether a genuine dispute as to any material fact exists, the Court views the evidence "in the light most favorable to the nonmoving party," *see, e.g., Johnson v. Cooper T. Smith Stevedoring Co., Inc.,* 74 F.4th 268, 272 (5th Cir. 2023) (citation omitted), without "making credibility determinations or weighing the evidence," *Turner v. Baylor Richardson Med. Ctr*., 476 F.3d 337, 343 (5th Cir. 2007) (citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000)).

Where the movant bears the burden of proof, it must "demonstrate the absence of a genuine issue of material fact" using competent summary judgment evidence. *Celotex*, 477 U.S. at 323.

However, "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence." *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994). Should the movant meet its burden, the burden shifts to the non-movant, who must show by "competent summary judgment evidence" that there is a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Lindsey*, 16 F.3d at 618. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *See Sec. & Exch. Comm'n v. Arcturus Corp.*, 928 F.3d 400, 409 (5th Cir. 2019) (citation and internal quotation omitted). On cross-motions for summary judgment the Court "review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Texas v. Rettig*, 987 F.3d 518, 526 (5th Cir. 2021) (citation omitted).

### III. LAW AND ANALYSIS

#### A. Abandonment/Waiver

In its opposition to Hignell plaintiffs' motion for summary judgment, the City asserts Hignell plaintiffs improperly raised by summary judgment motion certain claims that were not pleaded in their most recent, amended complaint, and urges the Court to disregard and to dismiss these claims. *See* Rec. Doc. 183 at 2–3 (first citing *Bye v. BGM Resorts Int'l Inc.*, 49 F.4th 918 (5th Cir. 2022); then citing *Jackson v. Gautreaux*, 3 F.4th 182 (5th Cir. 2021); then citing *Sims v. City of Madisonville*, 894 F.3d 632 (5th Cir. 2018) (per curiam)). During oral argument, Hignell plaintiffs took the position that their most recent, amended complaint supplements—rather than supersedes—their original complaint and any earlier amended complaints. *See* Rec. Doc. 241 at 23–24 (transcript of oral argument on Nov. 8, 2023) (contending certain claims the City argues were not in amended complaint were pleaded in "initial complaint"). Unfortunately, that position

is incorrect. Additionally, certain claims were never raised in the original complaint nor in the appeal before the Fifth Circuit, e.g., the City's lack of federal or state authority to regulate the **duration** of residential use of residential private property via STR ordinances.

An "amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading." *See, e.g., Stewart v. City of Houston Police Dep't*, 372 F. App'x 475, 478 (5th Cir. 2010) (citations omitted) (affirming district court's decision that claim included in initial complaint, but omitted in amended complaint, and subsequently raised on summary judgment was "abandoned"). Here, Hignell plaintiffs did not "specifically refer to and adopt or incorporate by reference," *id*., any of their earlier complaints in the most recent, amended complaint. Thus, Hignell plaintiffs' most recent, amended complaint "supersedes" all earlier complaints, rendering them "of no legal effect." *See id*. at 478. Because of this, claims initially included in an earlier complaint, but not adopted or incorporated by reference in the most recent, amended complaint, and then raised only by summary judgment motion, are considered abandoned or waived.[5]

Alternatively, and in order to facilitate later review, an analysis of claims asserted in the amended complaint that address the newly enacted ordinances at issue will be addressed <u>along with</u> those that were either abandoned or only recently argued by way of summary judgment.

**B.  Merit Analysis**

1.  Hignell plaintiffs' challenge to the City's general authority to regulate STRs in residentially located, residentially zoned private property, for residential use, based on the duration of that use, is **DISMISSED**.

---

[5] Hignell plaintiffs contend there has been no legal abandonment or waiver of claims, and they stand on their amended complaint. With that in mind, we find that another amendment to cure instant pleading deficiencies would be futile in view of the analysis *infra* on the merit of claims asserted and sought-to-be-asserted by plaintiffs.

Whether in the amended complaint or initially in the motion for summary judgment, we reject the general notion that the City is not authorized under either Louisiana or federal law to regulate and zone the duration of residential use[6] of residential private property.  Rec. Doc. 170-1 at 2–3 (motion for summary judgment); Rec. Doc. 160 (amended complaint).[7] There is no applicable or binding authority that has previously found that a municipality is unauthorized by constitutional or statutory principles to lawfully regulate use of residential property based solely upon the duration of use as a residential short-term rental. As correctly acknowledged by plaintiffs, municipal police power is broad but not unlimited. *See* Rec. Doc. 170-1 at 13 ¶E. There is positive authority for instant regulations.[8] *See City of New Orleans v. Dukes,* 427 U.S. 297, 303–04 (1976) ("Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest . . . . [I]n the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendmt [sic].").

The Fourteenth Amendment of the U.S. Constitution guarantees that individuals shall not be deprived of their property without due process of law. U.S. CONST. amend. XIV, § 1. To raise a federal substantive due process claim, a plaintiff must establish that he/she holds a

---

[6] While Hignell plaintiffs liken themselves to traditional residential lessors who are being denied property rights, they have not made clear to this Court how agreements for short-term rentals—which Hignell plaintiffs acknowledge are typically advertised on platforms like Airbnb or Vrbo, where guests do not enter a lease or rental agreement directly with the host—are comparable to a traditional lease agreement in Louisiana. Short-term rentals are a type of transient lodging typically for use of less than thirty days for vacation and/or attendance at special events in the City like the Sugar Bowl, Bayou Classic, and Mardi Gras.

[7] Notably, Hignell plaintiffs opine that the "duration" issue is not a new claim, but a new argument. *See* Rec. Doc. 211 at 1–2. Absent persuasive analysis, they argue it is an equal protection violation to regulate a thirty-one-day rental differently from a twenty-nine-day rental. While acknowledging the broad authority of regulators to exercise police power over the landowner's use of property within the limitations of the Constitution, Hignell plaintiffs' argument assumes a violation here due to the absence of language in Louisiana's enabling statute to allow the City to zone or regulate STRs <u>based solely on duration</u>. *See* Rec. Doc. 170-1 at 14 ¶F.

[8] If there is a Takings Clause-based argument here, again, the reliance upon that provision is also rejected. *Hignell-Stark*, 46 F.4th at 324-25.

constitutionally protected property right. *See Simi Inv. Co., Inc. v. Harris Cty., Tex.*, 236 F.3d 240, 249 (5th Cir. 2000); *see also Brennan v. Stewart*, 834 F.2d 1248, 1257 (5th Cir. 1988) ("A violation of substantive due process, for example, occurs only . . . when the government works a deprivation of a constitutionally protected interest."). The nature of a property interest must be determined by state law. *Simi*, 236 F.3d at 250; *see also Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1046 (5th Cir. 1998) ("In order to assert a violation of [the Fourteenth Amendment], one must at least demonstrate the deprivation of a protected property interest established through some independent source such as state law.").

Louisiana law instructs that for a due process property right to be constitutionally protected, it must be vested. "To have a property interest protected by due process, a person must clearly have more than an abstract need or desire for it. He must have a legitimate claim of entitlement to it rather than a unilateral expectation of it." *Am. Int'l Gaming Ass'n, Inc. v. Louisiana Riverboat Gaming Comm'n,* 2000-2864 (La. App. 1st Cir. 9/11/02), 838 So. 2d 5, 16 (citing *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972)). A license, once issued, may create a property interest in the holder that is traditionally protected by due process notions. *See Bell v. Burson*, 402 U.S. 535, 539 (1971); *Montecino v. Louisiana*, 55 F. Supp. 2d 547 (E.D. La. 1999). But Louisiana state law affords a license applicant no individual entitlement to a license that he/she seeks. *See Durham v. Louisiana State Racing Comm'n,* 458 So. 2d 1292, 1295 (La. 1984). There is no contest here that property owners do not have a vested right to lease their property for profit in any certain way, without reasonable and constitutional restrictions. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–36 (1982) (granting that the right to lease property for profit can be subject to restriction or regulation under certain circumstances); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981) (internal quotation omitted) ("The power of local governments

to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities. But the zoning power is not infinite and unchallengeable; it must be exercised within constitutional limits.").

Local governmental authorities in Louisiana are expressly authorized to adopt, implement, review, and enforce standards for land use, zoning, and historic preservation of areas and structures. *See* LA. CONST. art. VI, § 17; *City of Baton Rouge/Par. of E. Baton Rouge v. Myers*, 2013-2011 (La. 5/7/14), 145 So. 3d 320, 328–29 (interpreting La. Rev. Stat. §§ 33-4721, 4722, and 4780.40–41).

The reliance by Hignell plaintiffs on state statutory law found in Louisiana Revised Statute § 33:4721, titled Regulation of size and use of buildings, is misplaced. The state statute clearly provides:

> **For the purpose of promoting health, safety, morals, or the general welfare of the community, the governing authority of <u>all municipalities may regulate and restrict</u>** the height, number of stories, and size of structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and **<u>the location and use of the buildings, structures, and land for trade, industry, <u>residence, or other purposes;</u> provided</u> that zoning ordinances enacted by the governing authority of municipalities or the acts of the zoning commission, board of adjustment as herein provided for, or zoning administrator shall be <u>subject to judicial review on the grounds of abuse of discretion, unreasonable exercise of the police powers, an excessive use of the power herein granted, or the denial of the right of due process, provided, further, that the right of judicial review of a zoning ordinance shall not be limited by the foregoing.</u>**

La. Rev. Stat. § 33:4721 (emphasis added).

The absence of "duration of use" language in the foregoing Louisiana laws do not per se nullify the municipality's express authority to adopt, implement, review, and enforce standards for residential use, zoning and historic preservation of areas and structures. *Id.* It would be nonsensical to interpret the absence of a temporal element into those laws as foundational support for the

suggested nullification of instant ordinances. To do so would ignore the enabling statute's express inclusion of "residence, or other purposes" as authorized subjects for municipal regulation and zoning. That broad authority is clearly within the purview of municipalities seeking to regulate STRs and other uses of residences. Among other things either stated in or in application of that statute, the related ordinances and actions of municipalities and its zoning bodies or officials are clearly subject to judicial review for an unreasonable or excessive use of police powers or denial of rights under the Commerce Clause, or denials of due process and equal protection under state and federal laws. We continue to conduct that review.

> 2. The temporary operator-residency requirement is not a violation of the Commerce Clause or the Equal Protection Clause.

Hignell plaintiffs argue Commerce Clause violations occur where the STR regulations prohibit out-of-state corporate entities from being operators of residential STRs[9] and require operators to reside permanently in the STR they operate. *See* Rec. Doc. 170-1 at 23 ¶D. The City counters that its ordinance comports with the Fifth Circuit's suggested use of operators to stay on the premises being operated for non-commercial short-term rentals and disputes the claim that the ordinance requires the operator to be a permanent resident of the city or state. *See* Rec. Doc. 172-2 at 9 ¶A.[10]

Record document 170-3, attached as an exhibit 3 to Hignell plaintiffs' motion for summary judgment, contains the following relevant regulations within CC No. 29381:

> Section 26-614 defines "Operator [as] a natural person[11] possessing a short-term operator permit. An operator who meets the legal requirements may also possess a short-term rental owner permit.

---

[9] Hignell plaintiffs' challenge on behalf of juridical entities will also be reviewed in the next section of this opinion.

[10] As noted *supra*, the Fifth Circuit stated: "The City could give STR owners the alternative of having an operator stay on the property during the night—thus acting as the 'adult supervision' that the City ostensibly hopes live-in owners will provide." *Hignell-Stark*, 46 F.4th at 328.

[11] As Louisiana Civil Code Article 24 provides, "There are two kinds of persons: natural persons and juridical persons. A natural person is a human being. A juridical person is an entity to which the law attributes personality, such as a corporation or partnership. The personality of a juridical person is distinct from that of its members." La. Civ. C. art.

Section 26-619 requires the STR to be "operated by a natural person age 18 or over holding a short-term operator permit . . . valid for one year . . . and shall be reapplied for annually." *Id.* at (a)(1)(2). The latter Section further requires proof that the operator "resides on the premises being operated a short-term rental." *Id.* at (b)(2). Such proof includes "evidence of recorded ownership or a current residential lease, as well as at the least two other forms of documentation with a matching address, including without limitation a utility bill, driver's license or state ID, or bank or credit card statement, establishing that the operator resides on the premises being operated as a short-term rental . . . [and] evidence that the operator has the permission of the owner to operate the property as a short-term rental . . . ." *Id.*

Rec. Doc. 170-3.

The foregoing codal language is clear. It is axiomatic that operators must stay on-site while the property is being used as a short-term rental. To ensure an operator's availability to receive and resolve complaints "during all periods of guest occupancy," the operator resides on the property being used for a non-commercial STR. *See* CC § 26-620(a)(1)(e); Rec. Doc. 170-2 at 22. The related zoning ordinance is supportive in that regards. The CZO states "[t]he operator, who may not be a guest, must physically reside in a bedroom on the lot of record containing the [STR] during any guest stays and, if required by the City Code, must maintain a primary residence on the lot." CZO § 21.8.C.18(h); Rec. Doc. 170-2 at 18. To become an operator, for instant purposes, the City Code cited above requires proof to show the operator will stay or reside at the site while its being operated as a STR, e.g. written agreement or lease with the owner and owner's permission to operate the STR. As such, there is no implication of Dormant Commerce Clause concerns. While referring to some forms of proof, the ordinance specifically allows other forms. It is not perfectly

---

24. The law grants juridical persons "the power to participate in legal life by the attribution of legal personality." *Brown v. State Farm Fire & Cas. Co.*, 2000-0539 (La. App. 1 Cir. 6/22/01), 804 So. 2d 41, 44, *writ denied*, 803 So. 2d 37 (La. 2001) (citing Prof. A.N. Yiannopoulos, *Louisiana Civil Law System* § 48 (1977)). While "'natural persons' enjoy general legal capacity to have rights and duties . . . a 'juridical person,' conversely, as a creature of the law and by definition, has no more legal capacity than the law allows." *Id.* at 45 (some internal quotations omitted) (citing Yiannopoulos § 53).

written,[12] but it captures the key purposes of having an on-site operator who's also required to respond to complaints within one hour. *See* CZO § 21.8.C.18(j); Rec. Doc. 170-2 at 18. The duration of operator-residency is inextricably linked to operation of the property as a short-term rental. As such, the operator is not required to be a permanent resident of the City, but only a temporary resident of the STR they are hired to operate during stays by STR guests.[13] Further, the ban on corporate entities being operators or owners of STRs in residential zones "visits its effects equally upon both interstate and local business." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987) (quoting Lewis *v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36 (1980)).

Additionally, the ordinance only has an incidental impact upon operators who wish to travel from their home state to Louisiana to become an operator of an STR. This regulatory regime requires STR operations to be performed in the home state, Louisiana, not out-of-state. As with permanent residents of the home state, the out-of-state operators would still have to live on-site during the property's use by a guest and show proof of that. Proof of an operator's temporary durational-residency on-site during the active and transitory stay of a short-term-renter does not forbid such operators from participating in the residential STR market. There is no showing that the proof-requirement creates either an onerous or unreasonable burden on out-of-state residents. Importantly, the City Council did not adopt the Planning Commission's suggested language that would have required the operator to have their "**permanent** primary residential dwelling unit" on the STR. Rec. Doc. 178-2 at 34 ¶h. (Jan. 2023 Staff Report of CPC Meeting) (CPC-suggested

---

[12] We review the codal and zoning ordinances here in an effort to give semantic context and effect to the text for a reasonable interpretation.

[13] "At any given time, however, a person can reside in a place other than the domicile. In other words, although residence is required for the establishment of domicile of choice, continuous residence is not required for maintaining domicile as long as the intent is present. Domicile is a legal concept, whereas residence is usually a matter of fact." Nikolaos A. Davrados, *Louisiana My Home Sweet Home: Decodifying Domicile*, 64 LOY. LAW REV. 287, 354–355 (2018). "Courts have wisely avoided attempting a more precise definition of residence. Instead, they have accurately described residence as a person's 'dwelling place, however temporary, and regardless of whether he intends it to be his permanent home.'" *Id.* at 355.

language) (emphasis added). Under the foregoing, absent here is a requirement for the operator to become a permanent resident of the City of New Orleans or the state of Louisiana. Lastly, the temporary durational-residency requirement is narrowly tailored to advance legitimate local purposes without favoring Louisianans over residents of another state, and consistent with the Fifth Circuit's *Hignell-Stark* opinion.

In citing *Department of Revenue v. Davis*, 553 U.S. 328, 338 (2008), the Fifth Circuit stated: "The residency requirement can 'survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Hignell-Stark,* 46 F.4th at 328. The circuit court also reminded that if there are "any available alternative methods for [achieving the government's] legitimate policy goals," the residency requirement is invalid. *Id.* at 325 (quoting *Dickerson v. Bailey,* 336 F.3d 388, 402 (5th Cir. 2003)). However, "if a law merely imposes an incidental burden on interstate commerce, it faces much smoother sailing." *Id.* at 328. Under *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970), such a law will be upheld "unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.,* 550 U.S. 330, 346 (2007), (plurality opinion) (alteration adopted) (quoting *Pike*, 397 U.S. at 142). "State laws frequently survive this *Pike* scrutiny, though not always, as in *Pike* itself." *Hignell-Stark,* 46 F.4th at 328 (quoting *Davis*, 553 U.S. at 339). And local ordinances that discriminate against interstate commerce are not valid simply because they also discriminate against intrastate commerce. *Id.* at 327.

Justice Stewart stated in *Pike*, *supra*,

Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Portland Cement Co. v. City of Detroit*, 362 U.S.

440, 443 (1960). If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, *Southern Pacific Co. v. Arizona*, 325 U.S. 761 (1945), but more frequently it has spoken in terms of "direct" and "indirect" effects and burdens. *See, e.g., Shafer v. Farmers Grain Co.*, 268 U.S. 189 (1925).

*Pike*, 397 U.S. at 142.

We further find that the decision in *Rosenblatt v. City of Santa Monica*, 940 F.3d 439 (9th Cir. 2019) relative to an STR operator-residency requirement does not conflict with the *Hignell-Stark* decision's invalidation of a requirement that STR owners be the primary residents of and have a homestead exemption in their STR property. *Rosenblatt* concerned an ordinance adopted by the City of Santa Monica, California that prohibited owners or lessees of residential property to let their property for thirty days or less, with an exception for rentals where one of the dwelling unit's "primary residents" **lived on site in the dwelling unit throughout the visitor's stay**. The ordinance referred to the exception as "home sharing." *Rosenblatt*, 940 F.3d at 442–43. The Ninth Circuit rejected plaintiff's argument that the ordinance allowed only city residents to engage in the STR market because the Santa Monica ordinance did not require the primary resident of the home-shared dwelling to be the dwelling's owner. *Id.* at 450. As a result, the ordinance did not prevent an out-of-state owner of a Santa Monica residence from home sharing its property or extracting economic value from it. "For example, the out-of-state owner could rent out the property on a long-term basis with a condition that one of the rooms be used for the owner's short-term rentals. Or the owner could expressly allow the long-term renter to sublet a room on a short-term basis in exchange for paying a higher monthly rent. The ordinance also applies equally to owners who reside in Santa Monica, or elsewhere in California, but had a property separate from their rental property. Accordingly, the complaint fail[ed] to plausibly allege that the home-sharing exception

obviously advantages Santa Monica residents at the expense of out-of-state homeowners." *Id*. at 450–451.

We find the *Rosenblatt* analysis is persuasive here. The City's STR operator residency requirement passes the requirements of the Dormant Commerce Clause. Like in *Rosenblatt,* the City's 2023 operator residency requirement requires someone (i.e., the operator) to live on the STR site while it is being operated as such, but the operator does not need to be the owner or permanent resident of the City. "Thus, the challenged regulation permit[s] out-of-staters to enter [New Orleans'] STR market on equal terms as residents." *Hignell-Stark*, 46 F.4th at 326 n.16 (In discussing the Ninth Circuit's STR decision, Circuit Judge Smith stated "*Rosenblatt v. City of Santa Monica* . . . upheld an STR regulation requiring someone to live on the property full time, but that person did not need to be the owner of the property. *Rosenblatt*, 940 F.3d at 450–51. Thus, the challenged regulation permitted out-of[-]staters to enter Santa Monica's STR market on equal terms as residents.").

If the ordinance as interpreted by plaintiffs required operators to be permanent residents of the City or possess a homestead exemption for the STRs they operate, it would arguably create an invalid protectionist purpose and discriminate against interstate commerce on its face.[14] U.S. CONST. art. 1, § 8, cl. 3. As clearly stated by the Fifth Circuit, an on-site operator provides "adult supervision" that the City expects live-in owners would provide in order to mitigate against potential nuisances and encourages rentals to quieter guests. *Hignell-Stark*, 46 F.4th at 328. Moreover, the perceived temporary burden on commerce is neither clearly excessive nor

---

[14] However, a law with an incumbency preference may withstand Commerce Clause review where it is applied evenhandedly to all operators, regardless of whether they are from the home state or based elsewhere. *Cf. LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1023–24, 1028 (8th Cir. 2020).

unreasonable to advance those local interests and benefits, and no alternative reasonable measures have been shown here.

Hignell plaintiffs also cite public comments by some members of the New Orleans City Council who appear poised to ban all STR operations in the City. Under the law of the Fifth Circuit, evidence that legislators intended to ban potential permittees based on company form alone is insufficient to meet the purpose element of a Dormant Commerce Clause claim. *See Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n,* 945 F.3d 206, 217–18 (5th Cir. 2019) (first citing *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160–62 (5th Cir. 2007) (rejecting Allstate's discriminatory purpose argument because the record indicated only a desire by some regulators to treat business forms differently, without regard to location); then citing *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 500–01 (5th Cir. 2001) (rejecting discriminatory purpose argument because "the legislative history indicate[d] the legislature's intent to prevent manufacturers from utilizing their superior market position to compete against dealers in the retail car market")); *see also Exxon Corp. v. Maryland*, 437 U.S. 117, 125 (1978) (rejecting claims of disparate treatment because the statute did "not discriminate against interstate goods" or favor local companies over interstate companies). Somewhat similar to the corporate ban in the City's ordinances, the Fifth Circuit has upheld bans on public corporations from obtaining permits irrespective of location. *See Wal-Mart Stores, Inc.*, 945 F.3d at 220. ("The ban's effect on all public corporations provides strong evidence that the Legislature did not purposefully discriminate against out-of-state corporations.") As neither in-state nor out-of-state public corporations may obtain a permit, they are treated the same. *Id.* at 220.

      3.  As applied to all juridical entities, allowing only natural persons, including usufructuaries and trust beneficiaries, to become owners and/or operators of residential STRs comports with the varying standards of review to withstand instant challenges

pursuant to Commerce Clause, Due Process, Equal Protection, and First Amendment protections.[15]

When read in conjunction with one another, CC §§ 26-614, 617, and 619 and CZO § 21.8.C.18(k) give only natural persons the right to apply for owner and operator permits for residential STRs. Corporate entities are excluded from applying. However, juridical entities in good standing with the State of Louisiana may apply for a commercial STR permit. *See* CC § 26-617(a)(8). Slightly obscuring the precise distinctions it seeks to employ, the City also excludes usufructuaries and trust beneficiaries as residential STR owners. *See, e.g.,* CC § 26-614 (emphasis added) ("The term owner shall not include a person holding only a *usufruct* or leasehold interest in the property."); *id.* § 26-617(a)(1) (emphasis added) ("Ownership, in whole or in part, by a business entity, *trust*, or any other juridical person is prohibited.").

As a general theme throughout their arguments, Hignell plaintiffs broadly attack the use by the City of extensive studies and hearings that led to the City's stated purpose for enacting comprehensive standards for STRs, including the residential permitting given to natural persons. The City's stated purpose is to seek preservation of permanent housing stock, balance economic opportunity, reduce negative effects on availability of affordable housing, create a level playing field, ensure sufficient tax revenue collection, mitigate disruptive effects that unmonitored STRs can have on neighborhoods, and protect the livability and quality of life of the City's residential neighborhoods. *See* CC § 26-613; Rec. Doc. 170-3 at 2. The latter concern for livability and quality of life in residential neighborhoods forms the essential, rationally conceivable basis for the natural person requirement; but as seen *infra*, that concern can also be effectively achieved by natural persons who are usufructuaries and trust beneficiaries of residential STR sites.

---

[15] More analysis of subject classifications can be found *infra.*, Sect. 5, relative to broader constitutional challenges.

The stated purposes provided in the ordinance itself are sufficiently shown. The City's administrative record contains voluminous studies and multiple hearings that led the New Orleans City Council to express its goals for enacting comprehensive legislation. *See, e.g.,* Rec. Doc. 41-2 at 1–152 (STR Study 2018 ed.); Rec. Doc. 41-3 (affidavit of City's executive director of CPC); Rec. Doc. 49-7 (Evidence of Evictions due to STRs and Recommendations for STRs in Commercial Zones); Rec. Doc. 150 (parties' joint status memo, attaching 2023 CPC Staff Reports); Rec. Doc. 172-2 at 4–6 and attached Exhibits 1, 5–28, inclusive of staff reports, public hearings, etc.; *see also City of New Orleans v. Elms*, 566 So. 2d 626, 629 (La. 1990) (In interpreting La. Rev. Stat. § 33:4721, the Louisiana State Supreme Court recognized the City's statutory design is to promote the "health, safety, morals, or the general welfare of the community.").

While acknowledging the nonexistence of material factual disputes at Rec. Doc. 178 at 9, Hignell plaintiffs object to the reliability or admissibility of the administrative record. Their objection misses the mark with conclusory attacks upon study authors, sources, independent third parties, and findings relied upon by the City. For example, Hignell plaintiffs offer a recently commissioned report by a third party aligned with their interests to opine on the economic impact of the City's STR regulations. *See* Rec. Doc. 225-3 (STRs in NOLA, pgs. 1–17). Among other questionable conclusions, the latter report failed to test other factors upon conclusions about STRs' economic impact on the City's housing market, e.g. inflation or quality of life. Even assuming the usefulness of its economic data and conclusions, the report fails to refute the City's expressed reliance on its intended purposes/goals and related enactments. An imperfect reliance does not invalidate a legislative decision that is based on rational study and planning. *See, e.g., Horizon Concepts, Inc. v. City of Balch Springs*, 789 F.2d 1165, 1167 (5th Cir. 1986) (citing *New Orleans*

*v. Dukes*, 427 U.S. 297, 303 (1976)) ("[I]mprecision has long been permitted in regulations subject to minimal scrutiny under the Equal Protection Clause.").

Hignell plaintiffs assert the City's proof underlying STR purposes and rationale is unreliable. That is not the standard applicable here. Rather, the standard is whether the Court can reasonably conceive of any justification based upon the submitted record. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 440 (1985) (stating that zoning ordinances are upheld and presumed to be valid if the classification in the statute "is rationally related to a legitimate state interest"); *Shaw v. Smith*, 206 F. App'x 546, 548 (7th Cir. 2006). As in *Murphy v. Walworth Cnty.*, 383 F. Supp. 3d 843, 851 (E.D. Wis. 2019), it is reasonable to conceive community concerns over a home inhabited intermittently by various groups of temporary STR guests will lead to more traffic, trash, noise, and activity in the neighborhood, and less interest by STR guests in preserving the quality of life in a neighborhood because they will soon leave at the end of their STR stay. We cannot say that the City Council's judgments here so lack rationality that they constitute a constitutionally impermissible denial of equal protection, due process, First Amendment, or Dormant Commerce Clause protections.

It is reasonable to conceive that a natural person owner and/or operator would have more desire, interest, and accessibility to address neighborhood concerns arising readily and directly from STR operations within the mandated one-hour period for addressing complaints than corporate entities. However, it is also reasonable to conceive that a usufructuary, e.g. surviving spouse, and a trust beneficiary, e.g. adult child, would also have the same desire, interest, and accessibility. Plaintiffs correctly argue that under Louisiana law, usufructuaries enjoy the use of the property gifted or bequeathed to them, as do the beneficiaries of trusts. However, both plaintiffs and the City appear to mistake usufructuaries and trust beneficiaries as types of persons under

Louisiana law, namely, two subsets of juridical persons. *See* Rec. Doc. 170-1 at 20 (grouping "corporations, trusts, and usufructuaries" together); CC § 26-617(a)(1) (emphasis added) ("Ownership, in whole or in part, *by a business entity, trust, or any other juridical person* is prohibited.").

As previously noted, Louisiana law recognizes two types of persons: natural and juridical. *See* La. Civ. Code art. 24. Therefore, terms like "usufructuary" and "trust beneficiary" do not constitute other person types or subsets, but are used for our convenience to point to a person with a specific property right. *See, e.g., id.* art. 535 (defining the baseline term "usufruct," not usufructuary, as "a real right of limited duration on the property of another"). Persons with usufructuary and trust beneficiary interests may be either natural or juridical persons. *Compare id.* art 607 (natural person usufructuary) *with id.* art. 608 (juridical person usufructuary); *see also* La. Rev. Stat. § 9:1801 ("A beneficiary is a person for whose benefit the trust is created and may be a natural person, corporation, partnership, or other legal entity having the capacity to receive property."). The exclusion of natural persons who possess usufructuary or trust beneficiary interest from becoming permit holders offends constitutional protections because their exclusion has no lawful rational basis. The codal provisions containing the exclusion of natural person usufructuaries and trust beneficiaries are excessive restrictions that do not serve legitimate government interests.

Conversely, the admission of juridical corporate entities into residential STR operations would lead to unavoidable problems. For instance, changes in interests, policies, ownership, or control of a corporate entity during or after the permitting process would likely have lengthy administrative, regulatory, and potential legal consequences that unnecessarily lead to overwhelming costs and fees. Such consequences conceivably would have negative impacts upon

the peace and quietude of residential neighborhoods, particularly in the timely resolution of complaints about STR operations while awaiting decisive action up the corporate ladder.

While noting reasonable, nondiscriminatory alternatives to stated goals during its review, the circuit opinion also discussed how the stated goals and others could help achievement of those intended purposes. *Hignell-Starks*, 46 F.4th at 328–29. Moreover, while considered factors must be substantial in nature, as found to exist here, there's no need to "sift through the record to determine whether policy decisions are squarely supported by a firm factual foundation." *Horizon Concepts, Inc.*, 789 F.2d at 1167.

The perceived attempt to revisit the Takings Clause claims has been foreclosed by the circuit's affirmance of this Court's prior decision on that matter. *Hignell-Stark*s, 46 F.4th at 324– 25. Regarding the instant regulatory scheme and its uses, the same ruling and reasons are applicable now.

As discussed earlier, while the City's new regulations might encourage owners and operators to be residents, it does not mandate permanent residency or impose undue conditions upon nonresidents. Generally, to the extent the regulations limit residential STR ownership and operator status to "natural persons" over corporate entities, the limitation does not offend the Dormant Commerce Clause. However, the current ban upon natural persons who are usufructuaries or trust beneficiaries over residential STR sites is an offensive denial of equal protection. Any natural person—including persons with usufructuary rights and persons with trust beneficiary status—should be allowed to apply for an owner and/or operator permit. There is no favored status given to corporate entities based on their state of incorporation, situs of principal operations, or residency of any kind. Simply put, all juridical corporate entities are ineligible to apply for owner and/or operator permits for residential STRs.

As found earlier, the ban on corporate entities being operators or owners of STRs in residential zones "visits its effects equally upon both interstate and local business." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36 (1980)). We also note again that the ordinances do not prohibit out-of-state residents from residing as operators on the STR site during stays by its guests. Also, corporations are eligible to enter the STR market in commercial zones. There is no showing of invidious discrimination upon corporate interest.

Again, the test is not whether STRs actually create quality-of-life concerns, but whether the Court can conceive that the ordinances could potentially assuage those and similar concerns. *See Heller v. Doe*, 509 U.S. 312, 320 (1993) (stating that classifications must be upheld against equal protection claims if there is any reasonably conceivable state of facts that could provide a rational basis for the classification). Moreover, the Court need not use its imagination to conceive of the way zoning ordinances preserve the nature of a city center or understand a community member's concerns; these are scenarios that already exist.

In its avoidance of "economic Balkanization," the Dormant Commerce Clause prohibits economic protectionism and isolation. *Hughes v. Oklahoma*, 441 U.S. 322, 325–26 (1979) (citing *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 533–534 (1949) ("The few simple words of the Commerce Clause—'The Congress shall have Power . . . To regulate Commerce . . . among the several States . . .'—reflected a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.")

Courts continue to distinguish discriminatory or prohibitory regulations offensive to the Commerce Clause from a valid "exercise of the police power to regulate [commerce]." *Hughes*, 441 U.S. at 330. "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id*. at 331.

We find the focus upon natural persons—which in our analysis include usufructuaries and trust beneficiaries—is a justifiable allowance upon the preservation, in ways not inconsistent with the Constitution, of expressed legitimate concerns for "the livability and quality of life of the City's **residential** neighborhoods." *See* CC § 26-613; Rec. Doc. 170-3 at 2 (emphasis added). Usufructuaries and trust beneficiaries could be as effective as owners and operators as natural persons with the full bundle of property rights. The limited restriction upon corporate entities is not excessive in relation to putative local benefits to preserve the quality of life of its residents and unique character of the City's residential neighborhoods. Further, moving plaintiffs fail to show available alternative methods or less restrictive means for furthering those legitimate policy goals through ownership or operation by corporate entities in residential areas. *See Hignell-Stark*, 46 F.4th at 328–329.

4. The use of a lottery in the STR ordinances' permitting system is not an unconstitutional infringement of fundamental rights.

CC § 26-617(g) requires the City's Department of Safety and Permits to set forth processes and policies for awarding STR owner permits using a lottery or other mechanism "intended to

ensure the equitable distribution" of such permits. *See* Rec. Doc. 170-3 at 12. The zoning ordinances limit residential permit awards to one per square block, *see* CZO § 21.8.C.18(l)–(m), while providing a process to permit more on a case-by-case basis, *see id.* § 21.8.C.18(r). *See also* Rec. Doc. 170-4 at 18–20. Small multi-family affordable dwellings are exempted from the block limitation provided they are authorized in their base zoning district and compliant with other laws including the affordability monitoring requirement. *Id.* at 19; CZO § 21.8.C18(n).

Absent citation of supportive authorities, Hignell plaintiffs contend the ordinances "deny the fundamental property rights at issue here to the vast majority of property owners, awarding only one permit per city square and none at all if a B&B is previously located there." They believe the City is "thereby granting a monopoly to commercial STRs . . . or a preference for B&Bs in residential districts . . . ." *See* Rec. Doc. 178 at 21. They lastly argue the City has unbridled discretion in granting or denying exceptions to the square block limitations, irrespective of CPC recommendations. *Id.* at 24.

Based on cumulative and repetitive arguments made throughout other challenges, we will proceed to consider Hignell plaintiffs' conclusions in attacks upon the lottery system by examining Fourteenth Amendment rights to due process, equal protection, and protections afforded under the Commerce Clause.[16]

This opinion has previously noted that even accepting the contention that there is a vested property right to lease, Louisiana law still maintains that property owners do not have a vested right to lease their property for profit in any certain way, without restriction. Having a unilateral

---

[16] The novel attack upon municipal regulatory authority over fundamental property rights also appears to be another Takings Clause claim. If so, it is again rejected for reasons cited in prior opinions by this Court, the Fifth Circuit, and in aforementioned sections of this opinion.

expectation of receiving an STR permit does not thereby give rise to a clearly protected property interest.

The Fifth Circuit noted among other examples that placing a cap on the number of STRs in a neighborhood would be a way for the City to preserve affordable housing, reduce housing demand, and preserve the residential character of some neighborhoods. *Hignell-Starks*, 46 F.4th at 328–29. No one disputes that using a lottery system to award one residential STR permit in a square block is a cap upon the number of STRs in a neighborhood. Potential relief from the cap on permits is available in the appeal mechanism afforded to unsuccessful lottery participants pursuant to CZO § 21.8.C.18(r). *See, e.g., Jackson Court Condominiums v. City of New Orleans*, 665 F. Supp. 1235, 1248–49 (1987) (upholding an ordinance prohibiting timeshare condo development in a zoning district and recognizing City's equally significant interest in maintaining residential integrity, while also allowing aggrieved developer to seek a waiver of the prohibition). In doing so here, the City is expressly trying to balance the residential character of neighborhoods with an equitable way to allow reasonable participation in the STR market by non-prevailing lottery applicants.

As seen earlier, the nature of a property interest must be determined by state law. *Simi*, 236 F.3d at 250; *see also Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1046 (5th Cir. 1998) ("In order to assert a violation of [the Fourteenth Amendment], one must at least demonstrate the deprivation of a protected property interest established through some independent source such as state law."). Louisiana instructs that a license, once issued, may create a property interest in the holder that is traditionally protected by due process notions. *Bell v. Burson*, 402 U.S. 535, 539 (1971); *Montecino v. Louisiana*, 55 F. Supp. 2d 547 (E.D. La. 1999). But there is no individual entitlement to a license that's being sought initially or for renewal. *See, e.g., Durham v. Louisiana*

*State Racing Comm'n*, 458 So. 2d 1292, 1295 (La. 1984). Unilateral expectations of receiving an STR permit, like expectations of winning the STR lottery, do not create a fundamental property interest in either. *See, e.g., Am. Int. Gaming Ass'n, Inc. v. Louisiana Riverboat Gaming Comm'n*, 2000–2864 (La. App. 1st Cir. 9/11/02), 838 So. 2d 5, 16.

Additionally, the City's STR ordinances have not been shown to interfere with activity that is inherently national or requires a uniform system of regulation. Land use regulations are inherently local. They are not a significant burden on interstate commerce merely because they disappoint other interests. While it may be true that the ordinances likely divert tourism dollars from vacation rentals to hotels, the Supreme Court has held that "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 126–27 (1978) (explaining that local regulations that affect interstate commerce do not discriminate, even if they disproportionately affect out-of-state businesses, if they do not increase the relative market share of local businesses and rejecting "notion that the Commerce Clause protects the particular structure or methods of operation in a retail market"). Whether due to square block caps or other valid regulatory matters, the shifting of business from one competitor to another is neither a burden on interstate commerce nor a violation of due process or equal law protections. Conclusory suppositions of monopolizing competing local B&Bs and commercial STRs and similar conclusions of unbridled discretion of the City Council pursuant to the 2023 ordinances are unfounded in fact and law.[17]

---

[17] The prior ordinances infringed upon First Amendment protections as a prior restraint because the City had unfettered discretion to grant or deny a permit based on an applicant's eligibility **but provided no guidance as to what makes an applicant eligible or whether the dwelling unit meets the criteria "established by law."** Under the prior CC § 26-617 "Permit and application—Eligibility," the criteria merely include the application process and form material requirements. *See* Rec. Doc. 35-5 at 3; *Hignell,* 476 F. Supp. 3d 369, 2020 WL 4541478, at *2 (E.D. La. Aug. 6, 2020) (emphasis added).

    5.  The 2023 ordinances at issue withstand scrutiny under the First Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

Where consistent with this opinion, the circuit's opinion, and relevant issues, the Court's prior order and reasons dated August 6, 2020 granting the City's motion for summary judgment on First, Fourth, Fifth, and Eighth Amendment claims are adopted as additional support for findings made herein. *See Hignell v. City of New Orleans*, 476 F. Supp. 3d 369 (E.D. La. 2020), *aff'd in part, vacated in part sub nom. Hignell-Stark v. City of New Orleans*, 46 F.4th 317 (5th Cir. 2022).[18] Related findings in this opinion's foregoing sections are further support for findings in the instant section.

Hignell plaintiffs' broadly assert First Amendment challenges based on alleged "content based restrictions" in the following codal regulations:

    Sec. 26-618(a)(3) Content based restriction (only 1 STR per ad)
    Sec. 26-618(b)(1) Advertising an illegal STR (illegal because permit denied)
    Secs. 26-618(b)(2)–(4) Restrictions on advertisements' content
    Sec. 26-618(a)(3) Advertisements may only advertise 1 dwelling

Rec. Docs. 191-2, 195; *see also Hignell*, 476 F. Supp. 3d at 369.

In agreeing with plaintiffs that the prior ordinance intruded upon First Amendment protections against prior restraint, the Court reasoned the 2019 ordinance provided no guidance as to what makes an applicant eligible or whether the dwelling unit meets criteria under City laws. *Hignell*, No. 19-13773, 2021 WL 2886213, at *2 (E.D. La. July 9, 2021). The current City ordinances correct that deficiency.

The 2023 version of STR ordinances are more extensive than prior versions, with numerous explanations of the permitting process, criteria and conditions for granting or denying applications,

---

[18] Hignell plaintiffs successfully appealed the Commerce Clause ruling, lost on appeal the ruling regarding the Fifth Amendment's Taking Clause, but apparently did not directly appeal our ruling on other constitutional subjects noted here.

and rights to challenge same. Specifically, CC §§ 26-617 and 619 clearly set forth new rules and criteria for eligibility for owner and operator permits, respectively; CC §§ 26-618 and 620 specify duties required of permit holders; moreover, CC § 26-625, subparts 1–6, mandates issuance of a permit unless the applicant has any of six specific conditions in existence, e.g. a judgment from the City related to the subject property or against the applicant that has not been satisfied, *id.* at (a)(1); and CC § 26-628 establishes clear processes for permit suspension, revocation, hearing, and appeals from adverse decisions. Taken as a whole, the 2023 codal provisions are not the same ordinances that we previously rejected due to the absence of meaningful criteria or guidance in prior ordinances. For the foregoing reasons, the 2023 ordinances survive scrutiny under the First Amendment.

The overall challenges based on content or disclosure requirements fail. As found previously and now, "[a]s long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers, an advertiser's rights are adequately protected." *Hignell*, 2021 WL 2886213, at *3 (E.D. La. July 9, 2021) (citing *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626, 652 (1985)). Moreover, the burden on the businessowner in providing factual information regarding permits is minimal and commonplace because it only requires them to provide "somewhat more information than they might otherwise be inclined to present." *Zauderer,* 471 U.S. at 650. Here, the City has an interest in protecting guests and ensuring properties listed are properly licensed and operating within their permits.

Plaintiffs cannot seek to set aside on First Amendment grounds an ordinance that they contend would restrict their ability to communicate offers to rent unregistered or unlicensed STRs. "It is well-settled that the First Amendment does not protect commercial speech related to illegal activity." *Braun v. Soldier of Fortune Magazine, Inc.,* 968 F.2d 1110, 1117–18 (11th Cir. 1992)

(citations omitted). There is no constitutional interest in publishing STR ads that invite illegal use of an unlicensed STR unit. *See Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 566 (1980); *Murphy v. Town of Geneva Wis*., No. 15-222, 2015 WL 1546347, at *2 (E.D. Wis. Apr. 6, 2015). The challenged ordinances are constitutionally permissible under the First Amendment.[19]

Hignell plaintiffs still claim a vested property right to an STR permit or renewal of same. We again find that claim is not supported by relevant caselaw nor any of the STR ordinances. *Hignell*, 476 F. Supp. 3d at 375–77; *see also* related analysis done *supra* in Sects. 1, 4.

Hignell plaintiffs broadly contend the City's STR ordinances violate the Equal Protection Clause of the Fourteenth Amendment by their unequal and discriminatory treatment of similarly situated homeowners with respect to STR permits and regulations. The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. "The clause 'does not forbid classifications' because 'most laws differentiate in some fashion between classes of persons.'" *Harris v. Hahn*, 827 F.3d 359, 365 (5th Cir. 2016) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). Rather, the clause prevents governmental decision makers from treating similarly situated individuals differently. *See id.*

Thus, the first thing this Court must address with respect to equal protection claims is whether plaintiffs proved "that similarly situated individuals [are] treated differently" under the City's 2023 STR ordinances. *See, e.g., Texas Entm't Ass'n, Inc. v. Hegar*, 10 F.4th 495, 513 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2852 (2022) (internal quotations omitted) (quoting *Wheeler v. Miller*, 168 F.3d 241, 252 (5th Cir. 1999) (per curiam)). "Because the clause's protection reaches

---

[19] This would have been a different result had the ordinances required some pre-registration or clearance with the City for advertising information prior to placement of the STR ads for public viewing.

only dissimilar treatment among similar people, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws." *Id*. (internal quotations omitted) (emphasis omitted) (quoting *Hines v. Quivillivan*, 982 F.3d 266, 272–73 (5th Cir. 2020)). "To determine whether persons or groups are similar situated, we inquire as to whether they 'are in all relevant respects alike.'" *Id*. (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (sports bars featuring scantily clad waitresses were not similarly situated to erotic clubs under Texas law regulating sexually oriented businesses)); *see also Big Tyme Invs., L.L.C. v. Edwards,* 985 F.3d 456, 468 (5th Cir. 2021) (COVID-19 orders permitting restaurants to reopen by requiring bars to remain closed treated similarly situated business differently). "In making this inquiry, we must consider 'the full variety of factors an objectively reasonable . . . decisionmaker would have found relevant' when making the classification." *Golden Glow Tanning Salon, Inc. v. City of Columbus, Mississippi*, 52 F.4th 974, 978 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 1085 (2023) (quoting *Stratta v. Roe*, 961 F.3d 340, 360 (5th Cir. 2020)).

Hignell plaintiffs argue that "[a]ll persons who wish to rent their residences for less than thirty days are similarly situated." Rec. Doc. 170-1 at 24. When plaintiffs refer to "all persons," they believe that natural and juridical persons—be they usufructuaries, trusts, lessees, or corporations—are all similarly situated, and that the City only allows natural persons to obtain an STR owner or operator permit. However, the "inquiry is [more] case-specific" than plaintiffs make it. *See Golden Glow Tanning Salon, Inc.*, 52 F.4th at 978 (quoting *Stratta*, 961 F.3d at 360).

We are essentially being asked to nullify a municipality's recognized efforts to maintain its residential character by preventing the operation of STRs by corporate entities in residential

neighborhoods. Unquestionably, in our opinion, the municipality may restrict such uses without violating fundamental constitutional principles.

For purposes here, we construe natural persons with full ownership rights and those with usufructuary and trust beneficiary interests as similarly situated. They would constitute persons capable of being contacted directly in order to receive and expeditiously resolve complaints and other issues surrounding their residential STRs. However, while corporations are generally treated by law as persons, corporate juridical entities would not stand on the same footing. Their interest in preserving the residential character of neighborhoods is different by having an overwhelming primary motive, making a profit for their corporation. Corporate representatives' primary loyalties are also subject to changing corporate interests and policies. Conclusory argument fails to consider the full variety of factors an objectively reasonable decision maker would have found relevant when making the classification. There is no illustration how all corporate entities wishing to enter the residential STR arena for less than thirty days are in all relevant respects alike to natural persons with full ownership rights or with usufructuary or trust beneficiary status.

Accordingly, and in addition to findings in previous sections of this opinion, we find that plaintiffs have failed to show entitlement to judgment as a matter of law on their equal protection claims relative to corporative entities or representatives. They have shown, however, a violation respecting usufructuaries and trust beneficiaries. Allowing the latter set of natural persons to enter the residential STR arena does not thereby invalidate the entire set of ordinances. Rather, it merely expands the category of natural persons entitled to participate in the residential STR market.[20]

---

[20] In this regard, the Court also questions, without deciding, whether Hignell plaintiffs have standing to raise specific usufructuary and trust beneficiary-based challenges. We have received no indication that any fit into these narrow categories of Louisiana property ownership. As the Fifth Circuit emphasized in *Hignell-Stark*, dismissal of certain plaintiffs' claims on standing grounds is appropriate where the alleged injury is not suffered: "Once again, we must dismiss five of the plaintiffs . . . because they lack standing. [One plaintiff] doesn't claim to own rentable property and hasn't alleged that the residency requirement injures it in other ways. [Other plaintiffs] have homestead

Even if we assumed that Hignell plaintiffs showed all corporative entities are similarly situated to natural persons—including those who are usufructuaries or trust beneficiaries—which they did not, their claim would still fail. We turn to the "appropriate level of scrutiny for our review." *Big Tyme Invs*., 985 F.3d at 468. Rational basis review applies to legislative classifications unless the "classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class," in which case, strict scrutiny applies. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (per curiam) (footnotes omitted).

Although not explicitly stating it, plaintiffs seemingly agree with the City that rational basis review would apply here. *See* Rec. Doc. 170-1 at 24 ("The City cannot show that its unconstitutional ordinances are rationally related . . . ."). Under this standard, a governmental classification "will be upheld 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston, Texas*, 660 F.3d 235, 239 (5th Cir. 2011) (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993)). This "differential treatment is justified by any reasonably conceivable state of facts." *Id*. (internal quotation omitted). But the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary." *City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 446 (1985).

The City contends that the natural person requirement "further[s] the City's policy goal of limiting commercial impacts in residential areas and reducing the overconcentration of STRs in particular neighborhoods." Rec. Doc. 245 at 4. "The presence of a living, breathing human, a natural person, in conjunction with the operation of a short-term rental was a critical policy

---

exceptions, so the residency requirement isn't what caused their injuries." *Hignell-Stark*, 46 F.4th at 325 n.12. We reserve the standing question for later determination.

consideration in adopting this ordinance and is rationally related to the City's goal of reducing negative externalities from tourism in residential neighborhoods." *Id.* at 4–5. The same goal can be as effectively achieved by having a person who is a usufructuary or trust beneficiary of the property. Therefore, the distinction between natural persons, usufructuaries, and trust beneficiaries is found to be arbitrary, but not as between the latter group of persons and corporate entities or representatives.

In *Goldblatt v. Town of Hempstead*, 369 U.S. 590 (1962), the Supreme Court stated a standard of review to determine the validity of ordinances, relying on *Lawton v. Steel,* 152 U.S. 133 (1894). First it must appear that "the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals." *Goldblatt*, 369 U.S. at 594–95 (quoting *Lawton,* 152 U.S. at 137). Similarly, Louisiana law itself mandates that a zoning ordinance be reasonable. Louisiana Revised Statute § 33:4721 provides that any such regulation must be "[f]or the purpose of promoting health, safety, morals or the general welfare of the community" and that such a zoning scheme shall be subject to judicial review on the basis of, but not limited to, "abuse of discretion, reasonable exercise of the police power, and excessive use of the power herein granted . . . ." This has been construed to mean that the ordinance will be stricken if it is found to be "arbitrary or unreasonable, or that it bears no relation to the health, safety, or general welfare of the community." *Hardy v. Mayor and Board of Aldermen, City of Eunice*, 348 So. 2d 143 (La. App. 3 Cir. 1977), *writ denied*, 350 So. 2d 1212. However, these ordinances are presumed valid, and the party attacking the ordinance has the burden of proof to show that it is invalid. *Four States Realty Co., Inc. v. City of Baton Rouge*, 309 So. 2d 659 (La. 1974). That has not been shown here relative to the ban on corporate operations of STRs in residential neighborhoods.

In upholding an ordinance excluding industries and apartments in residential areas as not wholly arbitrary, the Supreme Court has stated: "If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control." *See Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388 (1926). Our deference here does not mean abdication of constitutional principles. Nor, on the other hand, do we sit as a zoning board of appeals. Courts continue to deal with economic and social legislation where legislatures have historically drawn lines which we respect against the charge of violation of the Equal Protection Clause if the law be "reasonable, not arbitrary," *F. S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920), and bears "a rational relationship to a (permissible) state objective," *Reed v. Reed*, 404 U.S. 71, 76 (1971). In sustaining the concept of quality of life, the City has a recognized responsibility to assure residential neighborhoods are attractive to families. Thusly, the ban as written on corporate involvement in residential STRs is in furtherance of such legitimate aims and, moreover, does not infringe upon fundamental constitutional rights.

Additionally, the challenge to a required amount of commercial general liability insurance fails.[21] First, the insurance-based challenge is not found in the amended complaint, but only raised for the first time in Hignell plaintiffs' motion for summary judgment. *See* Rec. Doc. 170-1 at 22. For that reason, it is dismissed. *See Bye v. MGM Resorts Int'l, Inc.*, 49 F.4th 918, 926–27 (5th Cir. 2022), *cert. dismissed*, 143 S. Ct. 1102 (2023) ("Neither the defendant nor the district court were required to read into the carefully stated complaint . . . a wholly different claim that was not pled. This is one reason why this court has 'repeatedly emphasized' that new claims need not be considered when first raised in summary judgment motions."). Alternatively, and for the sake of completeness, we will review it further.

---

[21] CC §§ 617(c)(8)(vi) and 26-618(a)(1) describe as a legal duty the carriage of a "minimum $1,000,000 in commercial general liability insurance . . . ."

Relying upon the Equal Protection Clause, Hignell plaintiffs assert in their summary judgment motion the insurance requirement treats them differently from other facilities that offer guest lodging, e.g. B&B operations. There is neither a constitutional prohibition to an insurance requirement nor a showing that such insurance is unobtainable, economically infeasible, or leads to unequal treatment amongst similarly situated STR operators. *See, e.g., City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 797–98 (1988) (no showing that the city would treat "nonpress permittees more favorably than newsrack permittees"). Assuming for argument's sake a difference in treatment can be found in this record—which hasn't been shown—a separate question becomes whether the City treats two similarly situated properties differently. Here, in the context of the City's permitting process and conditions for operations, STRs and B&Bs are in different positions: STRs provide lodging for one set of STR guests who rent the STR home with fewer bedrooms for their use than B&Bs that typically rent to separate sets of guests in separate bedrooms and not the entire B&B premises. Additionally, residential STR owners are individuals who conceivably are not as well-insured as other lodging operators who house more guests, e.g. B&Bs and hotels.

The Equal Protection Clause serves "as a shield against arbitrary classifications." *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 598 (2008). But not all classifications are subject to the same degree of judicial scrutiny. In the absence of a "classification affecting fundamental personal rights or based upon inherently suspect distinctions such as race, religion, or alienage," classifications or unequal treatment are "subject to the same rational basis analysis utilized in due process claims." *Jackson Ct. Condos., Inc. v. City of New Orleans*, 874 F.2d 1070, 1079 (5th Cir. 1989).

Despite the Supreme Court's emphasis on "classifications," the Equal Protection Clause "protects persons, not groups." *Engquist*, 553 U.S. at 597. For that reason, "an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based

discrimination, but instead claims that [it] has been irrationally singled out as a so-called 'class of one.'" *Id.* at 601. In other words, "when it appears that the government is singling out an individual, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a rational basis for the difference in treatment." *Id*. at 602.

To prove its "class of one claim," Hignell plaintiffs must show that (1) it "has been intentionally treated differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To show differential treatment, Hignell plaintiffs must identify a comparator group. *See Integrity Collision Ctr. v. City of Fulshear*, 837 F.3d 581, 586 (5th Cir. 2016). "[T]here is no precise formula to determine whether an individual is similarly situated to comparators." *Lindquist v. City of Pasadena Texas,* 669 F.3d 225, 233 (5th Cir. 2012) (quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004)). Rather, the Court must evaluate "the full variety of factors that an objectively reasonable . . . decisionmaker would have found relevant in making the challenged decision." *Id*. at 234 (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1203 (11th Cir. 2007)). As seen *supra*, STR operators are not similarly situated as homeowners who do not rent out their homes, nor are STR operators similarly situated to B&B or hotel facilities.

Courts are guided by the principle that "[t]he constitutional command for a state to afford 'equal protection of the laws' sets a goal not attainable by the invention and application of a precise formula. This Court has never attempted that impossible task." *Kotch v. Bd. of River Port Pilot Comm'rs for Port of New Orleans,* 330 U.S. 552, 556 (1947).

A law which affects the activities of some groups differently from the way in which it affects the activities of other groups is not necessarily banned by the Fourteenth Amendment. *See, e.g., Tigner v. State of Texas*, 310 U.S. 141, 147 (1940). "Otherwise, effective regulation in the

public interest could not be provided, however essential that regulation might be. For it is axiomatic that the consequence of regulating by setting apart a classified group is that those in it will be subject to some restrictions or receive certain advantages that do not apply to other groups or to all the public." *Atchison, T. & S.F.R. Co. v. Matthews,* 174 U.S. 96, 106 (1899). Even if the selective application of the liability insurance regulation is discrimination in the broad sense, it does not necessarily deny equal protection of the laws. *See Kotch*, 330 U.S. at 556. For instance, there is no showing that B&Bs and hotels fail to carry such insurance or that they are exempt from such a requirement. It is inconceivable those facilities would operate without sufficiently insuring themselves from claims arising from accidents on their premises involving a higher volume of guests than residential STRs. Without the regulation at issue, it is conceivable that STR home operators would not have sufficient liability insurance to adequately cover guest injuries.

"As long as there is a conceivable rational basis for the official action, it is immaterial that it was not *the* or a primary factor in reaching a decision *or* that it was not actually relied upon by the decision-makers *or* that some other non-suspect irrational factors may have been considered." *Reid v. Rolling Fork Pub. Util. Dist.*, 854 F.2d 751, 754 (5th Cir. 1988) (emphasis in original). "[D]ecisions that are imprudent, ill-advised, or even incorrect may still be rational." *Da Vinci Inv., Ltd. P'ship v. City of Arlington, Texas,* 747 F. App'x 223, 227 (5th Cir. 2018) (per curiam) (quoting *Rossi v. West Haven Bd. of Ed.*, 359 F. Supp. 2d 178, 183 (D. Conn. 2005)).

Further, the STR ordinances do not prohibit non-commercial social events of the type plaintiffs describe, e.g., a birthday party. Plaintiffs' contentions remain unpersuasive and speculative. Section 26-620(b)(8) states that STRs are only prohibited from being operated as commercial reception facilities. Specifically, the codal section provides in pertinent part:

> Prohibited Acts. The following acts shall be prohibited and may be grounds for suspension or revocation of a[n] [STR] Permit . . .

> 6) Exceeding the guest bedroom limitation set forth in the Comprehensive Zoning Ordinance.
> 7) Exceeding the guest occupancy limitations set for in the Comprehensive Zoning Ordinance.
> 8) No dwelling unit associated with a [STR] owner permit may be used as a **reception facility, or any other commercial use** defined by the Comprehensive Zoning Ordinance. **No special even permit shall be obtained for an event occurring at a dwelling unit during any period of guest occupancy.[22]**

CC § 26-620(b)(6)–(8) (emphasis added); *Hignell*, 476 F. Supp. 3d at 384.

As done in this Court's prior opinion, the latter codal section must be read in context with CZO § 21.8.C.18(c). The zoning ordinance's reference to social events clearly limits such events to noncommercial use of the STR in order to comply with the above-cited codal directive, CC § 26-620(b)(6)(7)(8). It would be an extreme and illogical interpretation of the ordinances to find in them a ban of a simple birthday party. While poorly worded, we discern no prohibition upon a purely personal and noncommercial celebration, e.g. a birthday party, for STR guests. No reasonable factfinder could interpret the subject ordinances differently. Accordingly, this case presents no unreasonable or irrational regulations preventing association of assembly based on conceivable rational basis for same.

Similarly, the First Amendment, while certainly protective of the right to congregate and exchange political ideologies and ideas, in all likelihood does not extend to something as speculative—and in this context, soporific—as ordinances noting specific requirements for the number of persons legally allowed to sleep in the bedroom or the number of bedrooms of an STR.

The Fourteenth Amendment provides that states may not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend XIV. "In order to establish either a substantive or a procedural due process violation by claiming denial of a property right,

---

[22] Short-term rentals cannot be utilized as commercial reception facilities or to receive special event permits, which allow permit holders to sell alcohol at special events. *See* CC §§ 26-618(b), 10-52 (special event permits).

[plaintiffs] must first establish a denial of a constitutionally protected property right." *Bryan v. City of Madison, Mississippi*, 213 F.3d 267, 274 (5th Cir. 2000) (citations omitted). The "Constitution does not create property interests; 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Schaper v. City of Huntsville*, 813 F.2d 709, 713 (5th Cir. 1987) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

Plaintiffs seemingly argue they are being denied the "fundamental right to lease" their residential property for whatever length of time they choose. *See* Rec. Doc. 170-1 at 11. However, as shown earlier, federal and Louisiana state jurisprudence do not support that argument. Plaintiffs' reliance on decisions interpreting the laws of other states is misplaced.

Further, while plaintiffs liken themselves to traditional residential lessors being denied property rights, they have not made clear to this Court how short-term rentals—which plaintiffs acknowledge are typically advertised on platforms like Airbnb or Vrbo, where guests do not enter a lease or rental agreements directly with the host—are comparable to a traditional Louisiana lease. The City argues that short-terms rentals are a type of transient lodging, which in the City's view, is completely different than a residential lease. We agree.

Accordingly, for the foregoing reasons and those cited in the previous section of this opinion, because Hignell plaintiffs have failed to establish the denial of a "property right," under the Due Process Clause, their due process claims fail. *Cf. Anding v. City of Austin*, No. 22-1039, 2023 WL 4921530, at *12 (W.D. Tex. Aug. 1, 2023); *FM Props. Oper. Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996) (*citing Shelton v. College Station*, 780 F.2d 475, 477 (5th Cir. 1986) (en banc), *cert. denied*, 477 U.S. 905 and 479 U.S. 822 (1986)).

6. Hignell plaintiffs' challenge to the City's prohibition or limitation upon STRs in certain areas as arbitrary and capricious is rejected.

This Court and the Fifth Circuit have recognized the City's extensive efforts to conduct studies and hold public hearings prior to determining the need, purposes and extent of STR regulations. As a result of those efforts, various areas of the City have been identified as unique historic districts deserving regulatory measures to preserve their historic character and quality of life therein.[23] For those reasons, the CZOs at issue were enacted for certain areas.

Zoning ordinances that regulate the extent of use or renovation of residential properties based on location in a designated historic district have been upheld. *See Mayes v. City of Dallas*, 747 F.2d 323 (5th Cir. 1984); *Your-Mar, LLC v. Jefferson Parish Council, et al*, 451 F. App'x 397, 401 (5th Cir. 2011) (rational basis found for an ordinance that limited duration and other business based on governmental authority's intent to provide identity and sense of community for a particular area, amongst other reasons). The unique character and historic nature of certain locations are matters of record. They form objective rational support for valid regulatory measures as here. For the foregoing reasons, the instant CZOs relative to locality of STRs have well-documented rational foundations and lawful authority.

7. Hignell plaintiffs' Fourth Amendment and due process claims relative to tax information, guest registration records, and property searches are **DISMISSED**.

The production of tax information provides a rational basis for assessing and collecting taxes under Louisiana Revised Statute § 47:1508 and City Code Chapters 30, Taxation, and 150, Taxation, at https://library.municode.com/la/new_orleans/codes/code_of_ordinances. The ordinance requires information thusly produced to be kept confidential. As stated in the Fifth

---

[23] For example, the Bywater, Garden District, Marigny, Treme, and French Quarter areas of the City were either designated as "Core Historic Districts" in New Orleans CZO § 9.1.C–F, placed on the National Register of Historic Districts in New Orleans City Code § 26-11, or recognized as a political subdivision in New Orleans CZO § 9.1.A–B.

Circuit's opinion, increasing taxes on STRs could serve as a rational basis to mitigate nuisance issues and fund increased enforcement. *Hignell-Stark,* 46 F.4th at 328.

Also, the production of guest registration records, e.g. occupancy dates, number of guests per party, per stay, rate(s) charged, with available redaction of guests' personal identifiers, is an additional reasonable means for assessing compliance with tax laws. *See* CPC Short Term Rental Study, 2018 ed. (Sept. 18, 2018) at Rec. Doc. 48-6, https://cityofno.granicus.com/MetaViewer.php?view_id=2&clip_id=3092&meta_id=424028; Certification of CPC Exec. Director Rivers, at Rec. Doc. 48-7.

Plaintiffs argue the "guest records requirements" are analogous to the requirements struck down by the United States Supreme Court in *City of Los Angeles v. Patel*, 576 U.S. 409 (2015) as facially unconstitutional under the Fourth Amendment. *See* Rec. Doc. 170-1 at 25. However— apart from plaintiffs' perfunctory argument failing to persuade or meet the requirements of Federal Rule of Civil Procedure 56—this Court has already addressed this argument, distinguishing application here from the *Patel* case and ruling in the City's favor on this exact claim when plaintiffs previously challenged the City's 2019 STR ordinances. *See Hignell v. City of New Orleans*, 476 F. Supp. 3d 369, 377–80 (E.D. La. 2020), *aff'd in part, vacated in part, sub nom. Hignell-Stark v. City of New Orleans,* 46 F.4th 317 (5th Cir. 2022). The 2019 City Code § 26-618(a)(2) contains the same language as it does today under the City's 2023 STR ordinances. Our prior ruling on plaintiffs' Fourth Amendment challenge to CC § 26-618(a)(2) was not subsequently raised or disturbed on appeal by the Fifth Circuit in *Hignell-Stark*. Accordingly, there is no reason why our prior ruling on the guest records requirement should be disturbed.

Hignell plaintiffs also appear to challenge CC § 26-617(f)(1)(d). CC § 26-617(f)(1)(d) requires STR owner permit holders seeking renewal of their permit to complete and submit a form,

which "shall include," among other information, "[a]ny IRS forms 1099 or other financial reports or documents provided to owners or operators by any platform related to rental activity on each platform used." CC § 26-617(f)(1)(d). The form containing such information "shall be deemed confidential tax records for purposes of La. R.S. 47:1508." CC § 26-617(f)(1). Plaintiffs argue the City requires this "personal" information "without cause to believe any unlawful conduct has occurred" and that the City "has no means by which to keep these records confidential and cannot guaranty their security." Rec. Doc. 170-1 at 25. "This," they say, "violates the Fourth Amendment." Rec. Doc. 170-1 at 25. Plaintiffs offer nothing more in support of this argument. Their argument, again, fails to persuade, and fails to meet Federal Rule of Civil Procedure 56's requirements. Additionally, the argument that the City "has no means by which to keep these records confidential" is rejected. As the City pointed out in its cross-motion for summary judgment, the City Code explicitly provides that such information "shall be deemed confidential tax records for purposes of La. R.S. 47:1508." *See* CC § 26-617(f)(1). There is nothing further of plaintiffs' argument for this Court to assess. *See* Rec. Doc. 170-1 at 25.

Relatedly, the City has shown that "[a]ll commercial enterprises and occupational licenses require such routine disclosures for the purpose of assessing and collecting taxes" and that the "City's authority to levy taxes is granted to it by it Louisiana's Constitution and Home Rule Charter of the City of New Orleans." *See* Rec. Doc. 172-2 at 19–20. The Fourth Amendment challenge to CC § 26-617(f)(1) lacks merit.

The ordinances only allow nonconsensual inspections or searches of STRs after probable cause is found for/and issuance of warrant from a municipal court judge. *See* Rec. Doc. 172-4 ¶1; STR Ordinance No. 29381 (as amended) § 26-624(c)(4). Further provisions of the latter section provide extensive and reasonable conditions for inspections and options. *Id.* § 26-624(c)(1)–(5).

Additionally, nothing forecloses an STR owner, operator, or guest with standing to seek available relief to challenge inspection requests and subsequent nonconsensual inspections in a court with jurisdiction over the challenge.

Plaintiffs further misconstrue or ignore the regulatory provisions that provide an opportunity for pre-compliance review prior to imposition of sanctions. The City has administrative procedures that require notices of violations and hearings before hearing officers who have been licensed to practice law in Louisiana for at least two years, all prior to any finding of violations or penalties. *See* City Code Administrative Procedures, §§ 6-3–36, https://library.municode.com/la/new_orleans/codes/code_of_ordinances?nodeId=PTIICO_CH6A DPR_ARTIIPUHEHOENHIDIFIVEZONUBUCO_S6-33APHEOF; *see also* CC § 26-628.

Procedural rules in the City Code expressly provide for the right to appeal determinations by the hearing officer to the Orleans Parish Civil District Court. *Id.*; CC § 6-41. The ordinances at issue do not have the constitutional deficiencies that were described in *City of Los Angeles. v. Patel*, 576 U.S. 409, 420–22 (2015) (failing to afford review of an officer's demand to search hotel guest records before imposing penalties for noncompliance) and *Weisenberg v. Town Bd. of Shelter Island,* 404 F. Supp. 3d 720, 735 (E.D.N.Y. 2019) (failing to provide opportunity for pre-compliance review before the assessment of fines against vacation rental owner who refuse production of rental registries upon request by local officials).

The claim that hearing officers appointed by the mayor are not neutral decision makers is rejected as unfounded speculation. As evidenced, without contradictory showing, the compensation of hearing officers is not linked or dependent upon the financial sanctions they might impose upon noncompliant STRs. *See* Professional Services Agreement of Administrative Hearing Officer for the City's Code Enforcement & Hearings Bureau at Rec. Doc. 49-8.

8. Plaintiff Marquart has shown a violation of a fundamental right to retain her STR permits until their expressed expiration dates. Pursuant to the City's compliance with this Court's injunction orders, we find that damages should be limited to a period ending on or about August 31, 2023 and no additional extension of existing injunction orders are warranted, subject to later reconsideration.

On April 1, 2017, plaintiff Tina Marquardt obtained her initial residential STR permit and had been operating continuously for several years. *See* Rec. Doc. 228-3. A City document indicates that on December 27, 2022 she filed an application for new permits, showing approval of same on January 13, 2023 and an expiration date of August 31, 2023. https://onestopapp.nola.gov/SummaryContent.aspx?type=License&id=285986; Rec. Doc. 236-2. On January 13, 2023, she paid five hundred dollars for the permits. Rec. Docs. 236-2, 236-3.

The official owner and operator STR permits issued by the City on January 13, 2023 show expiration dates of January 20, 2024, and January 12, 2024, respectively. Rec. Doc. 236-4 at 1–2. She reportedly had the only STR on her blockface at the time of issuance of the latter and other previously permits. *See* Marquart Affidavit, at Rec. Doc. 3-4 in consolidated action No. 23-5000.

However, she did not win the newly enacted lottery for the one STR permit for her block and, thereafter, was informed by email from the City on August 28, 2023 that her permit would no longer be valid after August 31, 2023. Rec. Doc. 228-5. The City's email directed her to cancel all STR bookings for her property after the latter date. *Id*. Marquart's separate action filed on August 30, 2023 was eventually consolidated with Hignell plaintiffs' action on September 12, 2023. Rec. Doc. 212.

At the time her residential STR permit was issued in 2017, Marquart argues that the City's original zoning scheme, applicable to her permit, promised that use of her licensed STR property would continue as a nonconforming use upon a change in the law notwithstanding any other provision in the ordinance. Therefore, the original zoning scheme under the relevant CZO required

that the City grant nonconforming use status to her property for the expressed term of the permit. In addition to justifiable reliance upon that CZO, she asserts the long-standing use of her property for STR purposes since 2017 established her property interest has vested for Takings Clause purposes. We agree.

The applicable Zoning Code § 25.2.C, entitled Authority to Continue, states:

> **<u>Notwithstanding any other provision in this ordinance</u>, any structure, use,** lot, or sign **that existed as a lawful nonconformity at the time of the adoption of this Ordinance**, **and any** structure, use, lot, or sign **that has been made nonconforming because of the terms of this Ordinance or any subsequent amendment may continue to be subject to the provisions of this Article so long as it remains otherwise lawful.**

CZO § 25.2.C (emphasis added).

In response, the City states it has not taken any enforcement action against Marquart. *See* Rec. Doc. 227-1 at 6. Specifically, the City states: "No action of the City of New Orleans has resulted in the ability of Petitioner [Marquart] to engage in STR activity pursuant to this Court's Orders of January 9, 2023 and August 31, 2023." *Id.*; *see also* noted orders at Rec. Docs. 145, 146, 202. The City further maintains that Marquart's STR permit did not become a nonconforming use because it was excluded under CZO § 25.3.C.4, which states:

> **The casual, intermittent, temporary, or illegal use of land or structures is not sufficient to establish and maintain the existence of any nonconforming use,** whether the use is a main or accessory use. In order to provide for the continuation of any established nonconforming commercial use, the business occupying the land or structure shall be in operation a minimum of four (4) hours per day, five (5) days per week. . . .

CZO § 25.3.C.4 (emphasis added).

As seen earlier, the City's efforts to address the proliferation of STRs and their impact on residential neighborhoods have been ongoing for almost a decade. Before enacting each of the ordinances at issue, the City received public comment and conducted various hearings. *See* Rec.

Doc. 235-1. Extensive litigation followed which resulted in rulings on the district and circuit court levels along with various motions, conferences, and hearings with all parties.

After the Fifth Circuit found a Dormant Commerce Clause violation in the City's requirement of a homestead exemption to obtain an STR permit, this Court directed the parties to consider in good faith certain matters for possible amicable resolution. The parties at that time were only Hignell plaintiffs and the City. To their credit, the latter parties requested entry of consent judgment which allowed for the continuation of residential transient lodging activity while new ordinances were being drafted and implemented in order to comply with previous rulings by this Court and the Fifth Circuit. *See* Rec. Docs. 145, 146.

The Court approved that request and issued a consent order on January 9, 2023 which specifically directed the City to issue **interim STR permits to** Hignell plaintiffs and "**homeowners who applied for STR permits between December 1, 2019 and August 29, 2022 but were denied permits because the residence for which they sought the permit lacked a homestead exemption**." *See* Rec. Doc. 146 at 3 ¶IIA. (emphasis added). **The order also stated the temporary nature of interim STR permits issued pursuant to the order did not create a nonconforming use.** *Id.* at 3–4. As also requested by parties, the latter order contained a termination date for such permits: the effective date of the new ordinances at issue. *Id*. at 4. Marquart was not an active party to the foregoing events leading to the issuance of the January 9, 2023 consent order.

Because the January 9, 2023 consent order directed issuance of interim permits to homeowners who applied for STR permits between December 1, 2019 and August 29, 2022 but were denied permits because they lacked a homestead exemption, Marquart's permit did not constitute an interim permit. As shown earlier, she applied for permits on December 22, 2022—

prior to the noted consent order. In approving her application through issuance of new STR owner/operator permits in January 2023, the permits had expiration dates of January 12, and January 20, of 2024. Further, the consent order states that interim permits under the order shall cost no more than $125. Marquart paid $500—the cost of regular STR permits. She possessed a homestead exemption and, thusly, was never denied permits for lack of that exemption. Therefore, Marquart neither qualified for nor needed a permit issued pursuant to the consent order.

The new STR ordinances set July 1, 2023 as the effective implementation date. *See* Rec. Doc. 170-4 at 23 § 14. In April 2023 the City also set August 31, 2023 as the expiration date for all residential STR permits issued before the effective date of the new STR ordinances, i.e. July 1, 2023, regardless of the expiration date provided on such permit. *See* M.C.S. 29398 found at: https://cityofno.granicus.com/MetaViewer.php?view_id=42&clip_id=4500&meta_id=628438; Rec. Doc. 228-4.

"The existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." *Phillips v. Wash. Legal Found*., 524 U.S. 156, 164 (1998) (quotation omitted). Accordingly, we usually treat, as dispositive, the existence—or absence—of a property interest under state law. *Hignell-Stark*, 46 F.4th at 322–23 (first citing *Degan v. Bd. of Trs. of Dallas Police & Fire Pension Sys.,* 956 F.3d 813, 815 (5th Cir.), *cert. denied*, 141 S. Ct. 375 (2020); then citing *Van Houten v. City of Fort Worth*, 827 F.3d 530, 539–40 (5th Cir. 2016); then citing *United States v. 0.073 Acres of Land,* 705 F.3d 540, 544 (5th Cir. 2013) (per curiam)). As discussed *supra*, Louisiana law instructs that a license, once issued, may create a property interest in the holder that is traditionally protected by due process notions. *See Bell v. Burson*, 402 U.S. 535, 539 (1971); *Montecino v. Louisiana,* 55 F. Supp. 2d 547 (E.D. La. 1999); *see also TXI Operations, LP v. City of Mckinney, Texas*, No. 20-

353, 2023 WL 161942 (E.D. Tex. Jan. 11, 2023) (in a somewhat similar context, finding fundamental right to existing permit adversely affected by a rezoning ordinance). In consideration of the foregoing, the issuance of STR owner/operator permits for her property created a property interest protected by due process notions that Marquart had a reasonable expectation of being honored. As such, her property rights also vested at time of issuance of the permits and have nonconforming use status. Standing alone, and irrespective of classification as a conforming or nonconforming use[24] of her property, the City's August 28, 2023 directive to Marquart to cancel bookings after August 31, 2023 was a violation of the Takings Clause. To the extent Marquart is challenging the use of a lottery and related limit of one STR per blockface, that challenge is rejected for reasons cited *supra* in Section 4 of this opinion. We must also consider the impact of the August 31, 2023 restraining order and its subsequent conversion into a preliminary injunction the following month.

After hearings in open court on August 31, 2023 and September 27, 2023, this Court enjoined the City from enforcing the newly enacted residential STR ordinances until resolution of cross-motions for summary judgment from all parties. Rec. Docs. 202, 203, 223. Except for violations of state or local laws not at issue, the orders enjoined the City from "enforcing the short-term rental regulations enacted in Ordinances 29381 M.C.S. and 29382 M.C.S. pending this Court's decision as to the constitutionality of the above referenced ordinances." *Id*.

---

[24] A nonconforming use is defined as "[a] use which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance although it does not comply with the use restrictions applicable to the area in which it is situated[.] The permitted continuance of a nonconforming use is designed to avoid the hardship, injustice, and doubtful constitutionality of compelling the immediate removal of objectionable buildings and uses already in the area." *Redfearn v. Creppel*, 455 So. 2d 1356, 1358–59 (La. 1984) (citations omitted). A legal nonconforming use is "designed to protect those uses which were established before the enactment of a restrictive zoning regulation." *Vieux Carre Prop. Owners v. City of New Orleans*, 216 So. 3d 873 (La. App. 4 Cir. 2015) (citation omitted).

While the City directed Marquart on August 28, 2023 to cancel bookings after August 31, 2023, the City acknowledged that it would honor this Court's August 31, 2023 and September 27, 2023 injunction orders by not taking any action to prevent Marquart or other STR permit holders from operating. *See* Rec. Doc. 227-1 at 6; Rec. Doc. 241 at 10 ll. 15–17, at 47 ll. 21–23. (Transcript of oral argument held November 8, 2023). Further, as acknowledged by the City in the presence of Marquart's counsel of record, this Court stated in open court during oral argument on pending summary judgment motions that the injunction order applies to Marquart and they should be allowed to operate and not be subject to revocation while summary judgment motions are pending. Rec. Doc. 241 at 60 ll. 15–19, at 61 ll. 3–5. Therefore, the previously found takings violation was for a short duration.

As shown above, the August 28, 2023 directive to cancel bookings after August 31, 2023 constituted a violation of the Takings Clause. However, the injunction orders issued on August 31 and September 27, 2023 enjoined revocation of all then existing residential STR permits until resolution of instant motions. The injunction orders applies to Marquart's permits. Therefore, she could have maintained STR operations on August 31, 2023. After becoming a party to this consolidated action on September 12, 2023 (Rec. Doc. 212), Marquart proposed an order for preliminary injunction on September 13, 2023 (Rec. Doc. 214). A hearing was held on the preliminary injunction matter amongst other matters on September 27, 2023. While citing another judge's denial of Marquart's motion for a temporary restraining order as the law for that issue, *see* Rec. Doc. 224 at 52 ll. 20–22, this Court later clarified that the restraining order has now been extended into a preliminary injunction, *see id.* at 54 ll. 1–2. Further, the City correctly acknowledged that it could not enforce any of the new STR ordinances and would continue to abide by the preliminary injunction now. *Id*. at 54 ll. 18–24. Interestingly, Hignell plaintiffs'

counsel also stated during the hearing that by enjoining the City from enforcing the ordinance, Marquart should contact customer service at Airbnb and its counsel in order to restore her STR listing, assuring that such online platforms are providing such help. *Id*. at 19 ll. 11–13, at 20 ll. 12–15. Based on this reading of the record, it is likely that damages for Marquart should be limited to a period beginning on August 28, 2023 and ending on or about August 31, 2023; however, the Court reserves that issue for later determination.

Marquart seeks monetary damages and equitable relief for the unlawful taking of her vested property interest, i.e. residential STR permits. Regarding the latter, she argues for an extension of her permits beyond the resolution of instant motions. That request lacks factual and legal foundation. Even if there is discretionary authority to order such an extension, there has been no showing to warrant that extraordinary relief. To consider the request for monetary relief, including related attorney fee awards and costs, separate motions must be considered.

### 9.  Conclusions and Future Proceedings

For the foregoing reasons,

A. Hignell plaintiffs' motion for summary judgment is:

    a. Granted in part to allow natural persons with usufructuary or trust beneficiary interests to become owners and/or operators of residential STRs; and denied concerning juridical corporate entities seeking the same status; and

    b. Denied in all other respects.

B. Marquart plaintiff's motion for summary judgment is:

a. <u>Granted insofar as</u> she has shown a Takings Clause violation of a fundamental right to retain her STR permits until their expressed expiration dates; <u>and</u>

b. <u>Denied in all other respects</u>.

C. <u>The City's motions for summary judgment are</u>:

a. <u>Granted in part by dismissing</u> the following issues raised by Hignell plaintiffs: claims not asserted in Hignell plaintiffs' amended complaint; challenge to City authority to regulate residential STRs based on duration; objections to operator-residency requirement; objections to excluding juridical corporate entities from becoming owners or operators of residential STRs; challenge to use of a lottery system limiting residential STR permits to one permit per blockface; First Amendment objections; Fourteenth Amendment equal protection and due process objections relative to the exclusion corporate entities, requirement for commercial liability insurance, and prohibition of commercial use of residential STRs or uses requiring a special event permit, and claims asserting unlawful taking or denial of fundamental use of private property; and challenges to locality restrictions; objections to producing tax information, redacted guest registration records, and conducting property searches; <u>and</u>

b. <u>Denied concerning</u> restrictions against natural persons who are usufructuaries and trust beneficiaries.

c. <u>Granted in part by dismissing</u> Marquart plaintiff's request for an extension of existing injunctive relief orders beyond their current deadlines and

limiting potential damage award for the Takings Clause violation to encompass a period ending on or about August 31, 2023, subject to later reconsideration.

D.  <u>Damages, Attorney Fees, Costs, and other potential relief</u>:

Because plaintiffs have prevailed on some of their substantive claims as noted above, they may be entitled to limited damages, attorney fees, costs, and possibly other awards. **Accordingly, no later than March 29, 2024** they may file appropriate motions and notice same for hearings in accordance with the federal and local rules, including the requirement to meet and confer with opposing counsel prior to filing any motions.

So ordered this 27th day of February 2024

_____
Senior United States District Judge