1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4   MELISSA HIGNELL, et al.      *      19-CV-13773 c/w
                                 *      22-CV-2991
5   versus                       *      23-CV-5000
                                 *
6   CITY OF NEW ORLEANS          *      Section B
                                 *
7                                *      March 27, 2024
    Relates to:  All Cases       *
8   * * * * * * * * * * * * * * * *

9

10                ORAL ARGUMENT BEFORE
              THE HONORABLE IVAN L.R. LEMELLE
11               UNITED STATES DISTRICT JUDGE

12

    Appearances:
13

14  For Hignell Plaintiffs:      DAWN ADAMS WHEELAHAN, ESQ.
                                 1819 Joseph Street
15                               New Orleans, Louisiana 70115

16  For Marquardt Plaintiff:     The Washington Law Firm
                                 BY:  EDWARD WASHINGTON III, ESQ.
17                               7130 E. Renaissance Court
                                 New Orleans, Louisiana 70128
18
    For the Defendant:           Office of the City Attorney
19                               BY:  M. DANIEL MACNAMARA, ESQ.
                                 1300 Perdido Street, Suite 5E-03
20                               New Orleans, Louisiana 70112

21  Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
                                 500 Poydras Street, Room B-275
22                               New Orleans, Louisiana 70130
                                 (504) 589-7778
23

24
    Proceedings recorded by mechanical stenography using
25  computer-aided transcription software.

1                           **<u>INDEX</u>**

2                                                    <u>Page</u>

3    Oral Argument

4          Dawn A. Wheelahan, Esq.                    6

5          Edward R. Washington III, Esq.            27

6          M. Daniel Macnamara, Esq.                 38

7          Dawn A. Wheelahan, Esq.                   48

8          Edward R. Washington III, Esq.            50

9
     Ruling of the Court                             53
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        <u>**PROCEEDINGS**</u>

2                      **(March 27, 2024)**

3              (Call to Order of the Court.)

4        **THE COURT:**  Good morning.  Be seated, please.

5              Call it, Dena, when you are ready.

6        **THE DEPUTY CLERK:**  Civil Action 19-CV-13773,

7   Section B, *Hignell v. City of New Orleans.*

8              Counsel, please make your appearances.

9        **MS. WHEELAHAN:**  Dawn Wheelahan for the Hignell-Stark

10  plaintiffs.

11       **MR. WASHINGTON:**  Edward Washington on behalf of Tina

12  Marquardt.

13       **MR. MACNAMARA:**  Good morning.  Dan Macnamara on

14  behalf of the City of New Orleans.

15       **THE COURT:**  Good morning.  We are here on various

16  motions by the plaintiffs related to appeal issues as well as

17  the request to reinstate a previous injunction that the Court

18  had entered before its opinion in February of this year in

19  related matters.

20              There's also, however, something I will take up

21  at the beginning, a motion filed by the Hignell-Stark

22  plaintiffs to supplement the record with information about a

23  resident who, as I understand it, won the lottery, but there

24  were some issues concerning a bed-and-breakfast, I believe,

25  that might have been in the same block or whatever, and she

09:02

1  wasn't able to get her STR permit but that the process for
2  getting an exception to that limitation of only one STR per
3  block required her to pay a $500 nonrefundable fee and some
4  other things.
5       I'm taking that request to supplement the record
6  as evidence of the plaintiffs' contentions that the city's
7  regulations, at least as applied to this instance, were either
8  onerous or didn't provide proper due process.  I know that it's
9  noticed for hearing, I think, sometime in April.
10      Has the city had a chance to review that
11 particular motion?
12      MR. MACNAMARA:  I only just had a cursory glance at
13 it when it came over ECF, Your Honor.
14      THE COURT:  Well, I guess I'm asking you basically do
15 you at this time know if you are going to object to the motion
16 to supplement the record or not?
17      MR. MACNAMARA:  I'm likely to object to the motion to
18 supplement the record that was filed by the plaintiffs.
19      THE COURT:  What prejudice or what detrimental impact
20 would that supplemental information have on the city's
21 position?
22      MR. MACNAMARA:  Well, at the outset, I have not been
23 able to verify any information that was put in that motion,
24 Your Honor.  I don't know the facts that are in there.  I don't
25 know what bearing that has on this Court's opinion that had

09:04

1   been previously issued.  I really just am not in a position --

2   I don't know what benefit this supplementation would have for

3   the appellate court to address the issues that were decided by

4   the Court.

5           THE COURT:  Well, I'm going to take it as part of the

6   pleadings that were previously filed.  This is a last-minute

7   filing.  I just saw it yesterday.  Ms. Wheelahan claims that

8   she just got the information either from the lady or certain

9   other materials -- from Ms. Dybel, is it?

10          MS. WHEELAHAN:  Ms. Dybel.  The city sent it out on

11  March 20.

12          THE COURT:  So my position is that it doesn't impact

13  or prejudice any opposition that the city might have to

14  supplementing the record, nor does it impact or change my

15  decision in any way, but I will allow her to supplement to

16  record just to make it complete for that reason --

17          MS. WHEELAHAN:  Thank you, Your Honor.

18          THE COURT:  -- and the interpretation that I gave

19  that it's just an evidentiary issue that the plaintiff wishes

20  to present on what it contends to be some due process issues

21  concerning the exemption requirement and other issues in that

22  regards.  That's taken care of that one.

23          Let's go to the ones that we did have properly

24  noticed timely enough for everybody to discuss and expound upon

25  their respective positions.

09:06

1            Obviously we have two sets of requests from the
2    two sets of plaintiffs.  Even though they have common interests
3    to some extent, their arguments are a little bit different.
4            Let's go first with the Hignell-Stark
5    plaintiffs.  Ms. Wheelahan, you are up.
6            **MS. WHEELAHAN:**  Good morning, Your Honor.  Well, we
7    filed in a single motion our request for a § 1292(b)
8    certification.  As pertains to my plaintiffs, the Hignell-Stark
9    plaintiffs, that is largely moot because we have filed an
10   appeal under 28 U.S.C. § 1292(a)(1).
11           **THE COURT:**  What are you appealing?
12           **MS. WHEELAHAN:**  We are appealing what § 1292(a)(1)
13   allows us to appeal, which is the injunctive issues.
14           **THE COURT:**  Are you appealing a final judgment of the
15   Court, or are you appealing an interlocutory opinion?
16           **MS. WHEELAHAN:**  We don't have a final judgment as far
17   as I'm aware, Your Honor.
18           **THE COURT:**  Right, you don't.  So what are you
19   appealing?
20           **MS. WHEELAHAN:**  The order of February 27.
21           **THE COURT:**  An interlocutory opinion.
22           **MS. WHEELAHAN:**  Yes, it is.
23           **THE COURT:**  I disagree with your position on that,
24   and I will give reasons for that down the line.
25           I see no authority to support your position that

09:08

1   the filing of a notice of appeal to an interlocutory opinion of
2   the Court that's not made final by judgment -- in fact, I think
3   it's instructive from this case, the first appeal, where the
4   circuit found that an opinion that I made on the First
5   Amendment issue and the appeal in that regards was premature
6   because they said that I have not issued a final judgment in
7   that regards.  That seems somewhat similar to what you are
8   trying to do here.
9           MS. WHEELAHAN:  No, I don't think it is, Your Honor,
10  because what is at issue in our entire complaint, for the most
11  part, is equitable relief and injunctive and declaratory
12  relief, and that's what § 1292(a)(1) provides for appeal of.
13          THE COURT:  You don't believe your First Amendment
14  claim arose in that same context?
15          MS. WHEELAHAN:  That was the city's appeal.
16          THE COURT:  I understand.  But even if it was the
17  city's appeal, wasn't it the same context of the opinion on
18  that issue?
19          MS. WHEELAHAN:  No.  We filed under a different --
20          THE COURT:  If I would have entered final judgment,
21  as the Fifth Circuit said, it would have then made it an
22  appealable issue as opposed to something premature or
23  interlocutory.  Then we would be in a different interpretation
24  here.
25                  I don't want to waste time on this.  We will

09:09

1  move on.  Go to the merits of what you are arguing here.

2          **MS. WHEELAHAN:**  We are asking that the injunction

3  that was in place before the order was issued remain in place

4  pending appeal.  We are asking that because it is the citizens

5  of New Orleans who will suffer if the city is allowed to go

6  forward with enforcing the statute pending the appeal and then

7  the order is reversed.

8              Under the first appeal, we appealed what was

9  held to be a final judgment.  We didn't appeal under § 1292; we

10  appealed under 28 U.S.C. § 1291.  That's how that appeal was

11  different.  The city's appeal was dismissed because this Court

12  had not entered the relief on my claim that they appealed.

13  That's why it was dismissed.

14          **THE COURT:**  If I interpret your interpretation in

15  that regards as that notice of appeal having the effect that

16  you argued here and put in your materials, if it has that

17  effect and the § 1292 request for certification is moot --

18          **MS. WHEELAHAN:**  § 1292(b) not --

19          **THE COURT:**  Given your interpretation, then we

20  shouldn't even be considering these things because we would be

21  without jurisdiction.

22          **MS. WHEELAHAN:**  The § 1292(a)(1) appeal pertains to

23  injunctive relief encompassed in the order that we have

24  appealed.  My interpretation of the Fifth Circuit cases was we

25  should ask the district court for a stay of proceedings first,

09:11

1   and if we don't get it, then we go to the appeals court and ask

2   them.  But the Fifth Circuit prefers that we ask the district

3   court for a stay first.

4           THE COURT:  Let's take your argument concerning the

5   injunction issue.  You cited, for instance, the Texas cases

6   *Anding* and, I think, *Zaatari*, which was also cited before our

7   opinion in other briefings before the Court and also opinions

8   that I have read.

9               In *Anding*, the *Anding* court, after analyzing the

10  *Hignell* opinion from the Fifth Circuit, granted summary

11  judgment on the dormant Commerce Clause claim, finding that the

12  STR ordinances in -- what was that?  Dallas, I believe.

13          MS. WHEELAHAN:  *Anding* is Austin.  The Dallas

14  injunction agreed with my position on the duration argument.

15          THE COURT:  The *Anding* court found that the STR

16  ordinance's homestead requirement for type 2 licenses is

17  unconstitutional.  It also went on to say that the imposition

18  of a homestead requirement for individuals who owned a type 2

19  property prior to the 2016 revision of the City of Austin's STR

20  ordinances is unconstitutionally retroactive.

21              You have argued that the city and really no

22  municipality in this state would have the authority to regulate

23  short-term rentals based upon duration of use or what have you.

24  Does *Anding* and *Zaatari* really support you in that regard?

25          THE COURT:  The Dallas decision does, Your Honor.

09:13

1        **MR. MACNAMARA:**  *Zaatari*?

2        **MS. WHEELAHAN:**  No, the decision in the Dallas

3   injunction that I gave you.  That is the first case that I know

4   of besides mine that even argued the duration argument.  I

5   don't know if they got it from me or -- I was not aware of that

6   case.

7        **THE COURT:**  Even in that situation aren't there

8   differences between the laws of Texas -- in this context -- and

9   the laws of Louisiana and cases from Louisiana that interpret

10   the Louisiana constitution, the Louisiana statutes that are

11   cited not only in your briefs but also in my opinion -- aren't

12   they different?

13        **MS. WHEELAHAN:**  First of all, the *Zaatari* case relied

14   on federal law largely as well as Texas law.  The case that I

15   think your opinion cited was the *Jackson Court Condominiums*

16   case, and that case is distinguishable.  *Jackson Court* was a

17   timeshare.

18        **THE COURT:**  That's not my question.  My question is

19   do the Texas constitution and statutory laws in the context of

20   regulating property based on duration or otherwise or even the

21   absence of that, are they similar or are they dissimilar?

22        **MS. WHEELAHAN:**  I have not read the Texas

23   constitution, Your Honor, so I don't know.  What I read was the

24   Dallas injunction which essentially ruled, as I have argued,

25   that a state enabling statute there did not talk about housing

09:15

1   stock, did not talk about the things that the city talks about

2   in its statement of purpose in its ordinance, and nothing in

3   the Louisiana enabling statute allows a municipality to

4   regulate based on the duration of a permissible use.  It allows

5   regulation according to use but not duration.  That's my

6   reading of the statute.

7           THE COURT:  That opinion, even if I disagree on how

8   it came out in terms of its holding or an interpretation of

9   Texas laws as opposed to Louisiana laws -- even if I assume

10  what you are arguing here that it is somehow applicable to this

11  case, certainly it's not binding authority.  At most, it could

12  be considered persuasive authority unless distinguished.

13              Do you know the status of that particular case?

14          MS. WHEELAHAN:  I do not, Your Honor.

15          THE COURT:  What was the name of the judge on that?

16  I forgot.

17          MS. WHEELAHAN:  I don't remember the name of the

18  judge, but I can find it for you here in my iPad if you would

19  like me to, if I have a minute.

20              While I'm looking, Your Honor, I have not asked

21  you to reconsider your order.

22          THE COURT:  You are asking me to reinstate an

23  injunction to give you an opportunity to proceed on appeal.

24          MS. WHEELAHAN:  Right, right, right.  The standards

25  for that are likelihood of success, irreparable injury, whether

09:17

1    the stay would substantially harm other parties, and whether

2    the stay serves the public interest.

3            THE COURT:  We are talking about likelihood of

4    success based upon the authorities that you are relying upon --

5            MS. WHEELAHAN:  Okay.

6            THE COURT:  -- but go ahead.

7            MS. WHEELAHAN:  Let me see if I can find the Dallas

8    injunction for you.  This might take a minute.

9                Here we go.  It is Rec. Doc. 243-1.

10           THE COURT:  Yeah, I have that.

11           MS. WHEELAHAN:  The judge was -- she signed it, and

12   the name is not typed in so I can't read her signature.

13           THE COURT:  That decision, was it a final decision or

14   just an interpretation on meeting the factors for issuing

15   either a TRO or preliminary injunction?

16           MS. WHEELAHAN:  It's titled "Temporary Injunction."

17           THE COURT:  So when I asked in terms of the status,

18   obviously, whenever the Court issues a TRO, a temporary

19   injunction or a preliminary injunction, there is then normally

20   a later hearing on whether or not to issue a permanent

21   injunction.

22           MS. WHEELAHAN:  Of course.

23           THE COURT:  Do you know the status of that?

24           MS. WHEELAHAN:  I do not, but I can find out later.

25           THE COURT:  Well, we are fishing or cutting bait now.

09:19

1          **MS. WHEELAHAN:**  We are fishing or cutting bait now?

2    Okay.  Well, my guess would be that this injunction is very

3    well reasoned, and I would bet that the judge left it in place.

4                I'm looking at all this that I have on here, and

5    there's nothing that tells me that information, but that's easy

6    enough to find.  After the hearing I can let you know, call

7    Alexis and let her know.

8          **THE COURT:**  Go ahead.

9          **MS. WHEELAHAN:**  The other issues -- so there's the

10   duration issue that we have just discussed.  Other courts have

11   ruled differently, which shows that there is at least a

12   probability or a likelihood of success in the Fifth Circuit.

13   That's a Fifth Circuit court that ruled that way.

14               On the Commerce Clause issue, we disagree about

15   the *Rosenblatt* decision.  My reading of what the Fifth Circuit

16   said is that under -- not what *Rosenblatt* said, what the

17   Fifth Circuit said is that the city could order that a person

18   be on the premises during an STR stay but not required to be a

19   permanent resident.  That's my reading.  You and I differ on

20   that.  The court might differ on that.  There is at least a

21   possibility of success there.

22               The corporate entities issue, that, I think, we

23   have a strong likelihood of success.  I think the Supreme Court

24   has come down hard on several occasions that corporate entities

25   have the same rights as individuals.  *303 Creative*, *Burwell v.*

09:21

1  *Hobby Lobby*, *Citizens United*, those Supreme Court cases hold

2  that.  So we disagree, but there is at least the likelihood of

3  success.

4          **THE COURT:**  Didn't those cases that you just

5  mentioned also indicate that there can be times when there

6  could be some restrictions or conditions placed upon corporate

7  entities?

8          **MS. WHEELAHAN:**  *303 Creative* didn't say that and

9  *Burwell v. Hobby Lobby* didn't say that.

10          **THE COURT:**  No, no, not the ultimate holding, but

11  saying, whether it's dicta or otherwise, that there are

12  situations where there can be certain limitations.  For

13  instance, a corporation cannot come into a city in order to

14  then, say, just pick any site it wanted in order to establish a

15  manufacturing plant.  That's a limitation on corporate

16  interests particularly in respects to zoning interests and what

17  have you.  Those are the kind of exceptions that I believe the

18  Court has acknowledged.

19          **MS. WHEELAHAN:**  That is not an exception, Your Honor;

20  that's a use.

21          **THE COURT:**  Still, whether you call it a use or an

22  exception, it's a restriction on corporate use --

23          **MS. WHEELAHAN:**  Well, sure.  We haven't argued --

24          **THE COURT:**  -- blatant use of its powers or what have

25  you using *Hobby Lobby* or whatever as authorities.

09:22

1    **MS. WHEELAHAN:**  We haven't argued that the city isn't

2    entitled to regulate use.  We have argued that STR is a

3    residential use, that leasing a residence in a residential zone

4    is a residential use.

5    **THE COURT:**  So if a corporate entity wanted to come

6    in and say, "Well, look, I know this is zoned residential or

7    it's restrictions concerning residential use issues, but we are

8    going to have exclusively an STR that is going to be operated

9    under corporate policies or what have you.  We are going to do

10   the usual things that corporations do in that regards," you

11   don't believe the city has any authority whatsoever to regulate

12   that use?

13   **MS. WHEELAHAN:**  That's what's at issue here,

14   Your Honor.  The city doesn't regulate 30-day rentals by

15   corporations.  A corporation could come in and buy up the

16   entirety of Treme and lease it for 31 days.

17   **THE COURT:**  Well, I don't know about that --

18   **MS. WHEELAHAN:**  There's nothing to prevent it.

19   **THE COURT:**  -- but let's stick to the issues that we

20   have here.

21   **MS. WHEELAHAN:**  My argument is that corporations are

22   not prohibited from owning residences, from leasing them for

23   31 days.  If anybody in this courtroom would like to go buy a

24   house and put it in an LLC and rent it for 31 days, there is

25   nothing to prevent that.

09:24

1    THE COURT:  What about the other issues that you

2   raised concerning the operator?

3    MS. WHEELAHAN:  I think that it is reasonable to

4   require an operator to be available.  At our very first -- not

5   our very first but our first summary judgment hearing post

6   revisions you, Your Honor, raised the issue that people don't

7   want to rent an Airbnb and have somebody else inside of it

8   invading their privacy.  To say that there is somebody else

9   inside the house essentially for many of the reasons that

10   people would rent a home -- in fact, the commercials that are

11   running now by Vrbo and Airbnb say get four hotel rooms or get

12   one home.

13    THE COURT:  Was the Fifth Circuit wrong, then, using

14   that argument that you just made about invasion of privacy when

15   it invited the city to consider having an operator stay

16   there -- not an operator -- yeah, operator stay there

17   overnight?  It didn't say, like the city says, there during the

18   day or at night or what have you.  It said overnight.  Was the

19   Fifth Circuit wrong?

20    MS. WHEELAHAN:  The Fifth Circuit was offering

21   several different suggestions after having said that in order

22   to overcome a discriminatory --

23    THE COURT:  Ms. Wheelahan, I would just like a simple

24   answer to my question.

25    MS. WHEELAHAN:  Was it wrong in suggesting that?

09:25

1          **THE COURT:**  Was it wrong?  Was it an invasion of

2     privacy for the Fifth Circuit to say that the city should

3     consider having an operator stay overnight?

4          **MS. WHEELAHAN:**  Was the Fifth Circuit wrong in

5     suggesting that?  No.  Courts suggest things in dicta all the

6     time.

7          **THE COURT:**  I know that's a different situation than

8     what the circuit suggested as opposed to what the city has

9     enacted because they are talking about having someone there not

10    only at night but also during the day.

11         **MS. WHEELAHAN:**  With a driver's license saying that

12    they have a permanent residence there.  That's what the

13    ordinance says.

14         **THE COURT:**  What else do you want to point out to me?

15              Oh, I did have a question to you.  As you know,

16    your co-plaintiff, Ms. Marquardt through her attorney

17    Mr. Washington, did file a motion for attorneys' fees and what

18    have you.  Have you filed one?

19         **MS. WHEELAHAN:**  Nope.  I didn't file one because I

20    asked -- I think it would be wasteful of the Court's --

21         **THE COURT:**  I'm not asking your opinion.  I'm asking

22    you did you file one pursuant --

23         **MS. WHEELAHAN:**  I just said no.

24         **THE COURT:**  -- to my order that you should file one?

25         **MS. WHEELAHAN:**  I just answered, no, I did not file

09:26

1    one.

2              THE COURT:  But again, that was an order of the

3    Court.  Do you think you have a right to disobey an order of

4    the Court?

5              MS. WHEELAHAN:  Did you order us to file a motion for

6    attorneys' fees?

7              THE COURT:  I said that there's relief here that's

8    available that the Court still has to consider:  attorneys'

9    fees, costs, maybe even other relief issues that may crop up

10   either for your clients or for the Marquardt client.

11             MS. WHEELAHAN:  Sure.  I understand, Your Honor.  The

12   reason I haven't filed that motion yet is that we asked you to

13   stay the proceedings, and we asked you to stay the proceedings

14   in this motion that we are arguing here today to avoid the sort

15   of waste that would happen -- I can file a motion for

16   attorneys' fees.

17             THE COURT:  Ms. Wheelahan, the Court is not asking

18   for reasons why you didn't file it.  You have already answered

19   it, and I know you did not file it, but no lawyer or party has

20   a right to ignore a court's order or assume --

21             MS. WHEELAHAN:  The deadline for filing is March 29,

22   Your Honor.

23             THE COURT:  Did I interrupt you, ma'am?  Did I

24   interrupt you?  You have no right to disobey a Court order.

25             MS. WHEELAHAN:  I didn't disobey a Court order,

09:27   1  Your Honor.  The deadline for filing is March 29.

2              THE COURT:  We disagree, Counsel.  We disagree.

3              MS. WHEELAHAN:  The deadline for filing in your order

4  is March 29, Your Honor.

5              THE COURT:  What else do you have?

6              MS. WHEELAHAN:  I would like to reiterate that the

7  deadline --

8              THE COURT:  If you are going to file it, file it.

9  Don't disobey my order.

10             MS. WHEELAHAN:  The deadline for filing --

11             THE COURT:  Or if you want to seek relief from the

12  order, saying that it will be a waste of your time to do it,

13  that's going to be denied if that's what you are arguing.

14             MS. WHEELAHAN:  What we have asked for is a stay, and

15  the deadline for filing that motion is March 29.  I can

16  certainly file the motion by March 29.

17             THE COURT:  I think you need to file it, Counsel, or

18  else it may be deemed waived.

19                 What else do you have for me?

20             MS. WHEELAHAN:  I would like to talk about the other

21  four criteria for a stay, which are the same as for an

22  injunction essentially.

23                 The plaintiffs will suffer irreparable harm if

24  they are not granted what we have asked for because they will

25  be forced -- the city has indicated that it will move forward

09:29

1  with enforcement of the ordinances immediately.  The citizens

2  of New Orleans as well as the plaintiffs will suffer from the

3  waste that would be incurred if the city moves forward as they

4  have.

5      THE COURT:  You submitted in that regards a letter, I

6  believe, from -- was it Airbnb or the other one, Vrbo, or

7  whatever?

8      MS. WHEELAHAN:  Airbnb.

9      THE COURT:  In that it said it would still collect

10 taxes, etc., or whatever.

11     MS. WHEELAHAN:  Correct.

12     THE COURT:  In that regards, the city has argued that

13 there's harm to the city or whatever in terms of not being able

14 to collect taxes or whatever, or they gave an example of going

15 against people who do not have an STR license.

16         What's your response to that latter argument

17 about the impact of the injunction on stopping operations that,

18 in the city's words, are illegal?

19     MS. WHEELAHAN:  Well, the injunction asks precisely

20 for relief for people who have STR bookings.  Jazz Fest is

21 coming up, French Quarter Festival.  People who had licenses in

22 the past, every license has expired.  They have bookings.  They

23 ask for relief.  The city --

24     THE COURT:  So none of your applicants -- well, some

25 were denied a license.  That's been resolved by the

09:30

1    Fifth Circuit concerning owners who are not residents or don't

2    have a homestead exemption.  Your people had licenses.  They

3    have expired.  They are not anyone who did not apply for a

4    license, right?  They all applied for a license?  They were

5    either rejected or they were expired?

6        **MS. WHEELAHAN:**  My plaintiffs all either had licenses

7    or applied and were denied.

8            The documents in the record show that there has

9    not been any proliferation of STRs.  The numbers that we gave

10   you that are there in the record are that there were 1,975.

11   Out of --

12       **THE COURT:**  You would agree, though, that the guests

13   who are interested in a short-term rental are usually

14   tourists -- might even be businesspeople on business trips, but

15   mostly tourists and the likelihood of them staying in what I

16   will call a tourist-friendly location may be the most occupiers

17   of these STRs?  Is that a fair assumption?

18       **MS. WHEELAHAN:**  It's not what I have seen,

19   Your Honor, because families come to visit.  I live in the

20   Uptown area.  Families come to visit their students and want to

21   stay in the Uptown neighborhoods close to Tulane and Loyola.

22   I'm sure that Xavier students --

23       **THE COURT:**  That's like a one-time event for

24   graduation ceremonies.  I'm talking about throughout the year.

25       **MS. WHEELAHAN:**  Throughout the year they come for

09:32

1    family events and stay in the Uptown neighborhoods as well as

2    in the tourist-friendly areas.

3          THE COURT:  From what I have seen in this record and

4    some of the studies that both you and the city have submitted,

5    it seems as if most of the guests are people who are coming to

6    stay in touristy areas that gives them access to some of the

7    bon vivant New Orleans I guess you could call it.

8          MS. WHEELAHAN:  That happens.

9          THE COURT:  Talk to me about the other issue that you

10   have raised and the likelihood of your clients' success in that

11   regards, and that is the use of the lottery and the exemption

12   process.  If you want, you can give the example of Ms. Dybel to

13   show support for your contention that either the lottery system

14   itself is somehow defective or the exemption process is

15   unconstitutional.

16         MS. WHEELAHAN:  I think the exemption process is

17   overly burdensome, and it's not explained adequately.  People

18   don't have adequate notice of it in the ordinance.

19               Just yesterday I was reading a Fifth Circuit

20   case.  *Braidwood*, I think it was called.  In it Judge Smith

21   said one of the emperor Nero's nasty habits was posting edicts

22   way up high on the columns so they were less easily read and

23   more easily transgressed.  I think that describes what we have

24   here.

25         THE COURT:  Even if a regulation is cumbersome,

09:34

1    inconvenient, does that make it a violation of either due

2    process procedurally or substantively?

3              **MS. WHEELAHAN:**  I don't think that I have argued

4    that, Your Honor.

5              **THE COURT:**  I'm sorry?

6              **MS. WHEELAHAN:**  I didn't argue that it was a due

7    process violation.  I argued that it was cumbersome, that it

8    required a $500 nonrefundable fee, that there were 42 separate

9    residences that Ms. Dybel was required to contact within a

10   square.

11                 The city keeps saying one STR per block.  It's

12   one STR per square, and her square has 42 separate residences

13   in it.  I think that's relevant.

14             **THE COURT:**  Argue to me, though, the legal authority

15   for saying that if it's cumbersome, difficult, that it somehow

16   is a violation of law.

17             **MS. WHEELAHAN:**  I think it's an equal protection

18   violation.  People who rent their houses for 31 days --

19             **THE COURT:**  As you know, due process and equal

20   protection can overlap, but if it's assuming an equal

21   protection argument, what's your comparative?

22             **MS. WHEELAHAN:**  Comparing it to a corporation who

23   rents a home for 31 days.

24             **THE COURT:**  Are they subject to a lottery system?

25             **MS. WHEELAHAN:**  No.

09:35

1          THE COURT:  So that's your comparative?

2          MS. WHEELAHAN:  I think that regulating people who

3   rent for 29 days different from people who rent for 31 days in

4   the same neighborhood in the same square on the same block,

5   regulating them differently without a showing that it

6   accomplishes the statements of purpose in the ordinance, I

7   think that's the violation.

8          THE COURT:  What else do you have to offer me?

9          MS. WHEELAHAN:  Whether the stay serves the public

10  interest and the injunction serves the public interest, it does

11  because it would prevent the waste of resources that we saw

12  happen during the summer when the city publicized its lottery,

13  conducted its lottery.  People relied on the lottery, having

14  won it, those who did, and then all of that was wasted because

15  the ordinance was still under consideration.  The same would

16  happen again.

17         THE COURT:  Wouldn't the public service argument

18  somehow get bootstrapped by the first factor, that is,

19  likelihood of success on your constitutional-based claims?

20         MS. WHEELAHAN:  Again, we are not required --

21         THE COURT:  A constitutional violation and the

22  likelihood of success on a showing of a constitutional

23  violation is something that serves a public interest, right?

24         MS. WHEELAHAN:  It is always in the public interest

25  to enjoin a constitutional violation.  That's --

09:37

1        **THE COURT:**  So the answer to my question is yes?

2        **MS. WHEELAHAN:**  -- well settled.

3              I'm not sure I heard all of your question.  What

4    was your question?

5        **THE COURT:**  Listen, Ms. Wheelahan.  The likelihood of

6    success on a constitutional violation, if found here, would

7    necessarily lead to the conclusion that that sort of an

8    injunction on a constitutional violation is in the public

9    interest?

10       **MS. WHEELAHAN:**  Yes, it would.  The answer is yes.

11             The Fifth Circuit cases that I have quoted to

12   you say that unlike a permanent injunction -- we are not asking

13   you for a permanent junction.

14       **THE COURT:**  I know.  I know.

15       **MS. WHEELAHAN:**  We need not show success.

16       **THE COURT:**  You want the status quo.  You want the

17   preliminary injunction that we had issued before.

18       **MS. WHEELAHAN:**  That's exactly right, Your Honor.  We

19   need not show success on the merits.  We only need to show that

20   we have serious issues, that other courts have differed.

21       **THE COURT:**  Likelihood of success.

22       **MS. WHEELAHAN:**  Yes.  We have shown you that other

23   courts have differed in their opinions.  That is in our record.

24   That's why we are asking you.

25       **THE COURT:**  All right.

09:38

1          Let's go to the co-plaintiff Mr. Washington for

2     Ms. Marquardt.

3          Before you sit down, Ms. Wheelahan, are any of

4     your plaintiffs, the so-called -- the Fifth Circuit used the

5     term and I'll use it here-- "Hignell-Stark plaintiffs," in a

6     similar boat as Ms. Marquardt?  Ms. Dybel is somewhat similar

7     because she -- not somewhat similar, it's dissimilar.  She won

8     the lottery but for other reasons had some other issues.

9          Are any of them similar to Marquardt, you had a

10    license, and then it was taken away or the city would call it

11    sunsetted?

12         **MS. WHEELAHAN:**  Yes.  It wasn't -- well, it was

13    sunsetted because Mr. Kurt Klebe had a license, and it was

14    taken away from him.  He spent more than $2 million renovating

15    a property on Magazine Street.  His license was taken away

16    because he is a former resident of New Orleans but now resides

17    in Denver.  So he wants his house to visit when he's here, and

18    he wants to rent it when he's not here.

19         So Kurt Klebe is in that position.  Hignell was

20    in that -- Hignell had White Spider Rental Concierge.

21         **THE COURT:**  The Fifth Circuit in a footnote said that

22    one of your clients didn't have standing.  Has that been

23    resolved?

24         **MS. WHEELAHAN:**  Standing for the Commerce Clause

25    claim, and that was because -- that's why I added Kurt Klebe to

09:40
1  the --

2           THE COURT:  That refreshes my memory.  Thank you.

3           MS. WHEELAHAN:  The others are New Orleans residents.

4           THE COURT:  Right.  Let's go to Marquardt.

5           MR. WASHINGTON:  Good morning, Your Honor.

6           THE COURT:  Good morning.  You don't have much to

7  respond to in terms of the city's opposition, right?

8           MR. WASHINGTON:  No, because it wasn't much of a --

9  well, the opposition was very brief.

10               We are here because the Court found that we have

11  a nonconforming use, and we totally agree with that; but from

12  there, it gets somewhat vague or confusing at the end of the

13  judgment.

14               The Court said the issuance of her STR

15  owner-operator permits created a property interest.  The Court

16  said her property rights are vested and she has nonconforming

17  use status.  The Court said the city's directive to cancel

18  bookings was a violation of the Takings Clause.  But then what

19  confuses this is that it says our pleadings are granted insofar

20  as she has shown a takings violation, a violation of a

21  fundamental right to retain her STR permits until their express

22  expiration date.  That's the problematic language we have.

23               In the body of the pleading, when you say

24  "nonconforming use," "vested rights," the city was wrong to

25  order her to cancel her bookings and, therefore, it is a

09:42

1    takings, it implies that all those three things -- your

2    nonconforming use, all that -- is all subsumed in takings, and

3    all those rights are limited to the expiration date of the

4    permit.  So once the permit is expired, she has no more

5    nonconforming use rights, she has no more -- all those things

6    awarded or recognized she no longer has.

7                    So what we are looking for initially is a

8    clarification that she has a nonconforming use that maintains,

9    that continues, and the permits are what effectuates the

10   nonconforming use.

11           **THE COURT:**  You cited in your motions -- and, of

12   course, I have also cited it in my opinion, and it was cited to

13   me beforehand in pleadings by you, I believe -- the *Redfearn*

14   case from the Louisiana Supreme Court in 1984.

15           **MR. WASHINGTON:**  Yes.

16           **THE COURT:**  There's a circuit opinion as well, I

17   believe, out of maybe the Fourth Circuit.  I'm going to quote

18   from *Redfearn* and ask you in this regard if this has changed

19   any under Louisiana law:

20                    "The purpose of zoning ordinances is to confine

21   certain classes of buildings and uses to certain localities.

22   Because a nonconforming use is inconsistent with this

23   objective, it should, consistently with the property rights of

24   the individuals affected and substantial justice, be viewed

25   narrowly and have all doubts resolved against continuation or

09:43

1    expansion of the nonconformity."

2                    That's the court in *Redfearn* at 455 So.2d 1359.

3    Do you see that?

4            MR. WASHINGTON:  I don't see it in my pleadings, but

5    I'm familiar with it, yes, uh-huh.

6            THE COURT:  What's your reaction to this if you take

7    that language about narrowly construing the continuation of or

8    expansion of the nonconformity -- which is what I was

9    considering when I issued my opinion about, yes, you have shown

10   a nonconforming use, yes, you have shown a takings, but I did

11   not find a basis -- given that narrow viewpoint, the view of

12   these things continuing or even expanding, I found that

13   basically it ended.

14           MR. WASHINGTON:  Those cases on continuation and

15   expansion come up in situations where there has been a

16   six-month vacancy mostly.  What those cases say, we have a

17   nonconforming use, and what's at issue is the continuation of

18   that nonconforming use because normally the city comes in and

19   says you have been closed for six months and so you have lost

20   your nonconforming use.  Then you get a battle over whether or

21   not there's a continuation of the nonconforming use, and the

22   same thing with expansion.

23           THE COURT:  I believe that's the *Dolsen* case out of

24   the Fourth Circuit from 1989 about a break in a nonconforming

25   activity over a certain period of time will result in the loss

09:45   1   of any nonconforming status.

2               **MR. WASHINGTON:**  Exactly.

3               **THE COURT:**  That's out of, I think, a zoning

4   ordinance of the city, correct?

5               **MR. WASHINGTON:**  I'm not familiar, but I take your

6   word for it.

7               **THE COURT:**  Counsel, that's a zoning ordinance of the

8   City of New Orleans, Article 13, Section 13.2.1.

9               **MR. WASHINGTON:**  That case involves whether or not,

10  once established, a nonconforming use is going to be continued

11  because there's been some six-month lapse.  That's how those

12  cases on continuation come up.

13              In those cases there's that provision about

14  narrowly construing, but there's another provision that says

15  the use of property should be broadly interpreted, and it often

16  conflicts with what you read.  Here we don't have that

17  situation.

18              Let me back up.  *Redfearn* was a Supreme Court

19  case.  It is like the godfather of nonconforming use, the

20  statement from which all other circuits have followed *Redfearn*.

21              Second, as to expansion, the same thing.  What

22  happens in an expansion case is that I'm operating a bar.  I

23  open up another area of my bar for consumption, or I do

24  something to increase the intensity of my use, or I physically

25  expand my footprint with a patio, as in the *Phillips' Bar* case.

09:47

1    Then the city gets into a battle with people, you have expanded
2    a nonconforming use, and that's illegal.  The neighbors call in
3    complaints they have expanded onto the patio.  So expansion and
4    continuation are narrowly construed and doubts resolved in
5    favor against the nonconforming use, but that's not what we
6    have here.

7         **THE COURT:**  You go a step further on behalf of your
8    client.  You believe she shouldn't even be required to go
9    through a lottery --

10        **MR. WASHINGTON:**  Exactly.

11        **THE COURT:**  -- to get her permit renewed.

12        **MR. WASHINGTON:**  Right, because what we had before
13   the lottery ordinances, before the one blockface limit, she was
14   a conforming use, and that's what the *Redfearn* case talks
15   about.

16             Then the city enacted more restrictive
17   ordinances.  That's the lottery ordinance that says all of a
18   sudden her use is restricted and the only way she continues is
19   through winning the lottery.  Also, the city enacted a one
20   blockface limit.  All of a sudden -- well, she is not
21   restricted by that because she is the only one on her
22   blockface, but in situations where there's three, all of a
23   sudden that's a more restrictive ordinance.

24             Nonconforming use means when you are a
25   conforming use, licensed by the city, the city enacts a more

09:48

1   restrictive ordinance in the form of this lottery and one per

2   blockface limitation and the rescission ordinance rescinded her

3   permit, she is entitled to the permitted continuance of her

4   nonconforming use designed to avoid hardship, injustice, and

5   doubtful constitutionality.

6           **THE COURT:**  Aren't you arguing, then, the

7   unconstitutionality of a retroactive provision in the STR

8   ordinances?

9           **MR. WASHINGTON:**  I could to the extent that the

10  city -- one of the provisions in the city's amendments

11  attempted to rescind nonconforming use just for short-term

12  rental permits.  To the extent that the city may try and use

13  that as a defense, I would argue retroactivity and that that's

14  not allowed.

15          In addition, the city's own zoning code says

16  notwithstanding any other ordinance to the contrary.  So the

17  zoning code envisioned there may be ordinances to the contrary

18  at some point and it tried to make that nonconforming use

19  language in the zoning code, which basically codifies *Redfearn*,

20  to say no matter what we are codifying *Redfearn* because that's

21  constitutional and you have a nonconforming use.

22          So her nonconforming use -- once the city

23  enacted the lottery ordinance and the blockface limitation

24  ordinance, we are grandfathered to that.  That's how

25  nonconforming use works.  You are a conforming use.  A more

09:50

1   restrictive ordinance is put on you.  You are nonconforming as

2   to those -- now you are nonconforming as to those restrictive

3   ordinances and you become a legal nonconforming use, and you

4   continue in that legal nonconforming use mostly forever.  The

5   Elms Hotel on St. Charles Avenue is a legal nonconforming use.

6   I think that's the *Redfearn v. Creppel* case.

7        THE COURT:  What's the status of the STR lottery

8   winner in your client's block?

9        MR. WASHINGTON:  We have no information on that.  We

10  don't know that she's done anything.

11       THE COURT:  You had argued before my opinion that

12  that lottery winner was either suspected or declared that they

13  weren't going to operate an STR.

14       MR. WASHINGTON:  Yeah.  These individuals were

15  individuals -- and I included a photograph -- who vehemently

16  opposed my client.  I included a photograph of them with

17  matching T-shirts standing in front of my client's property to

18  oppose her short-term rental, and they won the lottery.  Our

19  position is they have no intention of operating an STR.  My

20  understanding is that is part of what has happened in certain

21  instances.

22       THE COURT:  Is there a provision for individuals like

23  your client who didn't win the lottery or even those that won

24  it but like Ms. Wheelahan's supplemental information about the

25  lady who won it but had a problem going through the exemption

09:52

1   process because of the burdens that it had?  Would the

2   exemption process be subject to any requests to expedite that

3   process?

4           For instance, if there's some reason why, like

5   in your client's case, the winner of the lottery is not going

6   to operate the STR and made a sham -- I'm using the word "sham"

7   application to operate an STR by participating in the lottery

8   knowing, according to you, that that's not true, they have no

9   intentions of operating or starting an STR, is that a basis for

10   asking the city for expedited relief?

11           MR. WASHINGTON:  I mean, I think it should be but

12   probably not.  Let me point this out.  My client came in, I

13   believe, fourth place, third or fourth place, but there's -- my

14   client informs me that the first place, second place -- I mean

15   the second place and third place lottery -- you know, if you

16   come in second or third place, you could apply for a special

17   exception, but if you come in fourth place, you can't.  My

18   client came in fourth place -- or my client came in third

19   place.  If you come in third place, you can't apply for the

20   special exception.

21           Okay.  Oh, only the second and third place

22   applicants can qualify for the special exception.  If you are

23   in fourth place, you cannot.

24           THE COURT:  I don't know why, maybe it was in the

25   context of something that --

09:54

1          **MR. WASHINGTON:** Let me correct. My client came in

2  third -- okay. Go ahead.

3          **THE COURT:** When I was practicing law, the firm would

4  occasionally represent someone going before the council to seek

5  an exemption for something. In seeking that exemption for a

6  zoning issue, one in particular asked for an expedited

7  consideration. I forget whether it was granted or not but

8  nothing prevented to ask for it. I know that there's nothing

9  been cited in the record here of expediting that process, but

10  that doesn't mean it doesn't exist somewheres else.

11          **MR. WASHINGTON:** My understanding of the process, in

12  the normal process -- and I have read the process. It's the

13  normal process of applying for, say, a conditional use or a

14  zoning change for your property. So you have to do the

15  neighborhood participation project or whatever you call it.

16          So what that entails is, what Ms. Wheelahan was

17  talking about, you have to notify 40-some-odd neighbors by

18  mail. You have to do it right. You have to do it no more than

19  so many days before and no more than so many days after. You

20  have to have accommodations that satisfy ADA requirements,

21  etc., etc. You have to have sign-in sheets and you have to

22  have the signatures. Once you do that, you have to create a

23  report.

24          A lot of entities that do this hire consultants

25  to do it because that's only the first step. Any error in the

09:55

1  notice, the mailing didn't go out soon enough or it went out

2  too late -- any error can kick your application.  That's part

3  of an application packet, just the NPP.

4            After that, you have to fill out the necessary

5  information that's required, identifying information, what you

6  are going to do.  You may have to submit floor plans or a

7  schematic of your property, etc., etc.  Then you are docketed.

8  There's no expediting when it comes to applying for something

9  before the City Planning Commission.

10            As I stated in another hearing, the only way to

11 get it expedited, you go to your district council person and

12 ask them to submit a motion, put a motion at a council meeting

13 that orders the City Planning Commission to hear your case.

14            **THE COURT:**  That may be the context of what I recall

15 in that particular former client's case, going through one of

16 the council members within that district because they normally

17 defer to the council member in that district for these type of

18 issues, not necessarily obliged to but historically.

19            All right.  Anything else?

20            **MR. WASHINGTON:**  Well, back to what I'm saying, we

21 applied for permits and we were denied.  It wasn't acted on.

22 What my argument is, it's very basic.  It's a very basic

23 nonconforming use argument that she was a conforming use.  The

24 city enacted restrictive ordinances.  She became a

25 nonconforming use.  She's entitled to that nonconforming use to

09:57    1    continue.

2           Let me add, in my motion to reconsider, in my

3    memorandum in support, the city knows she is a nonconforming

4    use.

5           **THE COURT:**  I saw the memo.

6           **MR. WASHINGTON:**  Right.  The memo, when she reapplied

7    and her permits were renewed, she was renewed as a

8    nonconforming use, but nonconforming uses continue.  They are

9    not limited by the language you cited that deals with

10    continuation or expansion.

11          **THE COURT:**  I understand the argument.

12          Anything new?

13          **MR. WASHINGTON:**  Let me look at my notes.

14          I think that's it.  We are in a position where

15    we think we have a judgment in our favor because you indicated

16    we have a nonconforming use which should continue indefinitely,

17    but we have this limiting language that says takings expires

18    with the expiration of the permits, and nonconforming uses

19    don't do that, they don't expire.  We are asking for an

20    alteration of the judgment in that regard or reconsideration of

21    this Court's order to --

22          **THE COURT:**  Or clarification.

23          **MR. WASHINGTON:**  Yeah, or clarification, yes,

24    Your Honor.

25          **THE COURT:**  Thank you.

09:58

1            City.  Let's take it not the order in which it

2    was received but backwards, first the Marquardt motion and then

3    the Hignell-Stark motion.

4            You simply, I guess, rest upon the Court's

5    opinion and your prior briefings concerning Ms. Marquardt's

6    claims.  Do you acknowledge now that she has a nonconforming

7    use?

8            **MR. MACNAMARA:**  What I would like to acknowledge,

9    Your Honor, is what your last question was --

10            **THE COURT:**  Yes, no, you don't know.

11            **MR. MACNAMARA:**  Well, to the extent that she does

12    have a nonconforming use, that was all addressed by this

13    Court's opinion.  A nonconforming use, to the extent that she

14    had one, was in a residential short-term rental permit, which

15    no longer exists.  Mr. Washington claims correctly that the

16    city changed its ordinances, but it changed its ordinances

17    because the city's prior STR scheme was declared

18    unconstitutional.

19            Your Honor, you asked a very good question.  It

20    was your last question of Mr. Washington:  Anything new?  There

21    is not anything new before the Court, Your Honor.  This was all

22    argued.  It was briefed, rebriefed, and we extensively covered

23    this issue.

24            To the extent that she had a nonconforming use,

25    it was in something that no longer exists.  There are no longer

residential short-term rental permits.  The RSTR that she had,
those no longer exist after, for lack of a better word,
*Hignell I*, Your Honor.

In answer to your question, anything new, no,
sir, there is nothing new that was presented in his argument.
That's why the city was as brief as it was in its response to
Mr. Washington's pleadings.

**THE COURT:**  This issue concerning people who apply
for the lottery in order to then ultimately get an STR
license -- assuming everything else is in order in that
application process and that's also submitted in going to the
lottery -- and in Mr. Washington's client's case, the person
misrepresented themself is the way I interpreted their position
over the winner of the lottery who has no intentions, according
to them, of starting an STR, the city doesn't believe that that
has some ramifications that need to be addressed?

**MR. MACNAMARA:**  At the outset --

**THE COURT:**  But it's a sham -- if he's correct, it's
fraudulent.

**MR. MACNAMARA:**  At the outset, Your Honor, we have no
evidence that that's, in fact, the case.

**THE COURT:**  Let's assume that it is, that they are
right, that that happened.

**MR. MACNAMARA:**  Your Honor, someone is applying to
the city for a permit to do something.  The city cannot look

into the soul of that person and say, you know, they have the
permit, you know what, they haven't done any residential
short-term rentals for three months.  Are we supposed to, at
that point in time, impugn some motive to those persons?  All
of a sudden, the Jazz Fest comes around, and they decide that
they want to do it.

THE COURT:  It's not as general as that.  Certainly
someone who wins the lottery with an express intention of
having their application to operate an STR might experience
some problems in starting it up:  hurricane, COVID pandemic,
quarantines.  But someone who wins the lottery who you have
evidence presented has no intention of operating an STR, that's
different.

MR. MACNAMARA:  Again, Your Honor, we have not come
across that.

THE COURT:  So they haven't given you that
information?  I thought they gave that before my opinion was
issued.

MR. MACNAMARA:  As you recall, Your Honor, the whole
process was stopped.  The whole process came to a halt and so
we don't know that.  It is not before this Court.  There is no
evidence of that.  It's just not proper in considering what is
before the Court today as well.

THE COURT:  I just think it's another example that if
the city doesn't do anything about that kind of a situation or

10:03

1   address it, the people who legitimately would like to operate
2   an STR or historically have operated one that the city has
3   permitted them to operate, it leads to an unfair result.
4           MR. MACNAMARA:  There is the process by which someone
5   who did not win the lottery can go through the process to get
6   the exception.  That could possibly be grounds for an exception
7   in addition to any other reasons for it, Your Honor, is that
8   the one who did get the lottery -- I'm sorry, Your Honor.
9           THE COURT:  Why would the city even entertain or
10  require them to go to the exception when they show proof that's
11  not refuted that the person who won the lottery had no
12  intentions of operating an STR?
13          MR. MACNAMARA:  Your Honor, you have got me in a very
14  tricky situation.  It calls on me to speculate that
15  something -- when somebody applies for something --
16          THE COURT:  I'm not intentionally trying to trick
17  anyone.  I'm just giving you the facts of what's been presented
18  to this Court.
19          MR. MACNAMARA:  I was not suggesting that you were
20  trying to trick me.  I was just in a tricky situation,
21  Your Honor.  I'm not trying to impugn your question with any
22  additional color there.
23              My position is the city receives an application.
24  When the city receives an application, the city is assuming
25  that the person who is applying for that permit, whatever it

10:05

1    may be, intends to engage in that activity.

2                  Mr. Washington suggests that they didn't like

3    the manner in which his client was engaging in short-term

4    rental activity.  I don't know that, Your Honor.  I don't know

5    that.

6                  Again, getting to what's before this Court

7    today, anything new, no, sir, nothing new.

8              THE COURT:  Well, if you have a nonconforming use and

9    if in addition you have a violation of the Takings Clause, at

10   least in the Marquardt situation, he argues that Louisiana law

11   would allow his client's nonconforming use to proceed without

12   the requirements of going through a lottery, for instance,

13   which is, I think, the main reason why they are here, in that

14   regards.

15                  What's your response to Louisiana law,

16   particularly the *Redfearn* case?

17             MR. MACNAMARA:  Again, Your Honor, to the extent that

18   she had a nonconforming use, she had a nonconforming use in

19   something that no longer exists.  Those ordinances regarding

20   RSTRs were declared unconstitutional.  During the pendency of

21   this litigation, the city allowed those people who were engaged

22   in that activity to continue.  They put the sunset provision on

23   that.  This Court put the stay in place and then ultimately

24   ordered that to the extent they had a nonconforming use, it was

25   to the expiration of the permit that they had at the time of

10:07   1    the litigation.  RSTR no longer exists.

2         **THE COURT:**  Let's go to the Hignell-Stark claims,

3    particularly the one dealing with duration and corporate

4    entities.

5         **MR. MACNAMARA:**  Your Honor, again, we have litigated

6    all this as well.  One party always uses the term "rent."  As

7    you know, the city's position, we are talking about transient

8    lodging and the distinctions between that.

9              As to the issues that I think the Court was

10   inquiring in regarding Texas, I think there's specific

11   provisions in the Texas constitution that speak to that that

12   don't exist in Louisiana.  This is not a one-for-one

13   comparison.

14             The interplay between state law and the federal

15   law was at issue in those cases and, again, as this Court's

16   opinion demonstrates, those things don't exist here.  That's

17   why we are different in Louisiana than they may be in the state

18   of Texas.

19        **THE COURT:**  I don't recall that issue coming up

20   either before us or before the circuit, the duration issue at

21   least, until now.

22        **MR. MACNAMARA:**  I'm sorry, Your Honor, the duration

23   of --

24        **THE COURT:**  The regulation of use of property based

25   upon duration of use.

10:09

1        MR. MACNAMARA:  I think that was extensively covered

2    in this case, Your Honor.

3        THE COURT:  By the Fifth Circuit?

4        MR. MACNAMARA:  No.  I'm sorry.  I meant in the

5    pleadings that were presented to this Court.

6        THE COURT:  I don't recall that issue ever coming up

7    before the Fifth Circuit or before us before the

8    Fifth Circuit's opinion.

9        MR. MACNAMARA:  Again, Your Honor, I think the

10   distinction being what exists in the constitution of the State

11   of Texas and what exists here.

12       THE COURT:  What about on the corporate ownership

13   issue?

14       MR. MACNAMARA:  I don't think that there's any --

15       THE COURT:  I shouldn't say just ownership issues.

16   She is also attacking restrictions against a corporate

17   operator.

18       MR. MACNAMARA:  Your Honor, I don't think that we

19   have had any -- the calculus has not changed in that regard

20   either.

21       THE COURT:  If that's all you have to argue, then I

22   will go to rebuttal.

23       MR. MACNAMARA:  I mean, we do have the stay issue.  I

24   would like to address that, Your Honor.

25       THE COURT:  You stated in your opposition on the

10:10

1    injunction issue the unlikelihood of success, but you also

2    talked about the prejudice either to your client or the

3    citizens of New Orleans.  You stated as an example the tax

4    issue.  The tax issue would be a moot issue, right, in view of

5    that letter from Airbnb?

6        **MR. MACNAMARA:**  Airbnb is not the only corporation

7    that engages in this activity, Your Honor.  On information and

8    belief, our finance department, who can't disclose confidential

9    tax information -- even to me they won't do it -- have

10   indicated that they were contacted by at least one platform

11   which intimated that they may stop remitting taxes to the City

12   of New Orleans.

13            Airbnb is but one player.  You have Heirloom,

14   Vrbo, any number of entities that are engaging in that.  Just

15   one from Airbnb is not indicative of the industry as a whole,

16   Your Honor.

17       **THE COURT:**  You also in the prejudice argument stated

18   that there may be STRs operating that never had a license, let

19   alone applied for one --

20       **MR. MACNAMARA:**  That's correct, Your Honor.

21       **THE COURT:**  -- as somehow being prejudicial to the

22   city's ability to regulate.  Could an injunction keep that

23   window open for you, for the city?

24       **MR. MACNAMARA:**  If the injunction was to continue as

25   written, Your Honor, the city was enjoined from enforcing its

10:11

1    short-term rental ordinances.  All of that is baked in and is

2    intertwined with other aspects of the city code, so the city

3    would be prevented from doing that.

4         The city would also be prevented from allowing

5    those persons who are seeking to enter the market from doing

6    so.  We haven't issued any new permits.  We haven't been able

7    to enforce the regulations.  As the order was written, we were

8    allowed to perhaps enforce code enforcement things regarding

9    sanitation, but we are not allowed to enforce against --

10   because of the way it was written, we were unable to enforce

11   the ordinances, which includes going after those who don't have

12   permits.

13        **THE COURT:**  The city is aware of those who not only

14   don't have a permit but never applied for one?

15        **MR. MACNAMARA:**  Oh, yes, Your Honor, we are most

16   definitely aware of that.

17        **THE COURT:**  The city is aware of those that perhaps

18   don't have an operator that's on the premises during the guest

19   stays at these STRs?  Are you aware of those?

20        **MR. MACNAMARA:**  Well, that never went into effect, so

21   we were not enforcing against those who didn't have an operator

22   because that was stayed.  The enforcement was stayed regarding

23   that.

24        To your question as to whether we know people

25   who are engaged in short-term rental activity who don't have

10:13

1    permits, yes, Your Honor, we do.  It's a significant number.

2    It's a significant number, Your Honor.

3          **THE COURT:**  Your opponents have indicated and shown

4    some evidence of the city's intention now to proceed with

5    enforcement or at least process applications that's in

6    compliance with the ordinance provisions that I have found to

7    be constitutional.  What is the city doing about that

8    enforcement issue now as well as the finding that -- the

9    restriction against persons, individual persons who either have

10   usufructs or they are trust beneficiaries and they are not

11   corporate, what is the city doing to comply with that finding?

12   If you are going to apply those parts of my opinion that allow

13   you to proceed, what is it doing about that part of the opinion

14   that says, oh, no, you can't in this area?

15         **MR. MACNAMARA:**  Yes, Your Honor.  We are identifying

16   those persons to see where those people fell within the

17   process.  If those persons were denied on that basis, clearly

18   that's no longer a valid basis for denial.  So we are going to

19   reach out to those people who have applied or who may have been

20   denied under that process, Your Honor.

21         **THE COURT:**  So your opponents are correct, the city

22   is proceeding to enforce the ordinances, at least those that

23   are found to be constitutional?

24         **MR. MACNAMARA:**  Yes, Your Honor, those that have been

25   deemed to be found constitutional.  Yes, Your Honor.

10:15

1    **THE COURT:**  Is it going to do anything about the
2    Marquardt situation when a person has allegedly submitted a
3    false application?
4    **MR. MACNAMARA:**  Again, Your Honor, we don't have any
5    evidence that anyone filed a false application other than the
6    unsupported allegations by the --
7    **THE COURT:**  So the city is going to just ignore that?
8    **MR. MACNAMARA:**  Pardon me?
9    **THE COURT:**  The city is just going to ignore the
10   evidence from Marquardt in that regards?
11   **MR. MACNAMARA:**  I think we will address anything that
12   comes in, Your Honor.  I can't answer a question where I have
13   no evidence of that, Your Honor.  We have not seen that.  The
14   people that we have seen applying -- and if a person comes in
15   and gets a permit -- and, again, it might be the situation just
16   as you suggested.  Something has happened to the home.  They
17   have to put a new roof on it.  They have to do this.  They have
18   to do something else.  Just because they are not engaging in
19   short-term rental activities and putting it up on a platform on
20   day one does not indicate that they are not going to engage in
21   that activity in the future.
22   **THE COURT:**  All right.  Let's go to rebuttal from the
23   plaintiffs.  Five minutes, Counsel, for each side.
24   **MS. WHEELAHAN:**  I don't have a whole lot, Your Honor.
25   I would just like to stress that when the lottery was in

10:16

1  effect, these are the city's numbers from a FOIA request.  The

2  city says they only got 1,975 applicants.  535 of those

3  participated in the lottery.  473 competed with only one other

4  applicant in a square of approximately 30 to 40 residences.  So

5  there just aren't that many out there.  Although the city likes

6  to say that there are, there are not.

7          I would like to stress that nobody has a permit

8  right now.  Nobody has a permit.

9      **THE COURT:**  Have they applied for one?

10     **MS. WHEELAHAN:**  Even if people apply for one, the

11 city wasn't issuing any.

12     **THE COURT:**  Now I'm talking about.  It sounds like

13 they are opening it up.

14     **MS. WHEELAHAN:**  I'm not sure whether they are using

15 the lottery -- I don't know what the city is doing with respect

16 to permits, but to my knowledge they are not issuing permits,

17 and every single permit has expired.

18          The other thing is I hear lots of complaints

19 about our neighborhood is being overtaken by short-term

20 rentals.  If a person wants to rent their home even just for

21 Jazz Fest, they are required to put a placard on the front of

22 their house indicating -- they are putting their license

23 information on the house.

24          So you see these newspaper pictures where the

25 photographers will photograph a row of houses with a placard on

10:18

1   the front, but that's no indication that those people have

2   rented that house for more than a weekend or two per year.  If

3   the city wants a neighborhood to retain its residential

4   character, maybe they ought not to require people to put signs

5   on the front of their houses.

6            I think that's about all I have, Your Honor.

7            **THE COURT:**  Thank you.

8            **MR. WASHINGTON:**  Okay, Judge, I want to be very clear

9   on our position.  Nonconforming uses are in property.  It's the

10  use of property; it is not the use of permits.

11           The continuation provision you read me, a lot of

12  times in those cases you have a nonconforming use.  The issue

13  is whether it can continue, and permits are often evidence of

14  whether or not that use was continuing.  In that instance, if

15  the permits weren't there, it's evidence that the nonconforming

16  use ended.  Even permits, the possession of permits in use

17  cases isn't the absolute determination of whether or not your

18  use continued.

19           This is not a use case.  This is a nonconforming

20  use established by the passage of a more restrictive

21  ordinances.  What are those restrictive ordinances?  It's the

22  lottery ordinance, it's the blockface limitation ordinance, and

23  it's the sunset provision ordinance.

24           If you take a use away, that ordinance is a more

25  restrictive ordinance and, therefore, you become a

nonconforming use.  Whether you take it away, you cut it in
half, you decrease the intensity, whatever you do, that is a
more restrictive ordinance, and you become a nonconforming use.
You can continue the previous use at the same level.  That is
hornbook nonconforming use law.

Let me say something because one of the parts of
your judgment said, "To the extent Marquardt is challenging the
use of a lottery and related limit of one STR per blockface,
that challenge is rejected."  We are not necessarily
challenging that in general.  See, we are challenging the
application of that ordinance to nonconforming uses.  That can
continue for people who come after the passage of those
ordinances.

What I'm saying is my client and everyone like
her who had a conforming use prior to those ordinances now have
nonconforming uses.  Whether it's the Hignells, some of her
clients, if they had a conforming use prior to the passage of
these ordinances, those restrictive ordinances made her a
nonconforming use and permitted continuance to avoid hardship
and doubtful constitutionality.  That is our argument.  We are
head-on challenging any limitation of her nonconforming use to
a permit.

As further evidence of that, I cited that
memorandum from the city's own Department of Safety and
Permits.  What created that memorandum was the City Council

10:21

1  enacted an interim zoning district that said you cannot issue

2  permits, you cannot renew permits, so that was essentially a

3  restrictive ordinance or act.

4  So the department correctly said, well, when we

5  restrict the renewal, that makes you grandfathered.  That makes

6  you a nonconforming use.  When the City Council put in a more

7  restrictive IZD that said no more removes, then the department,

8  understanding what the nonconforming use law is, said you are

9  going to have to apply, meet these operational requirements or

10  whatever, and you will now become a nonconforming use.  Simple.

11  So either by that my client renewed in January,

12  under that memo she is a nonconforming use.  The more

13  restrictive ordinance adopted by the City Council at the end of

14  March, the limitation ordinance and the lottery ordinance, once

15  the city adopted that, they are more restrictive.  My client

16  goes from conforming to nonconforming.  Or the ordinance in

17  April that said we are sunsetting or we're just flat-out taking

18  everybody's permits away and saying they expire in August --

19  which is highly illegal.  What if they did that for bars and

20  restaurants?  You can't do that.  So all of that are more

21  restrictive ordinances that turns everybody who had a

22  conforming use into nonconforming uses.

23  Let me illustrate the absurdity of the city's

24  position.  There's a revised statute, 9:5625, which says if you

25  operate illegally for five years, right, and someone files a

10:23

1  complaint, gives the city written notice, and then you still

2  operate for five years, you become a nonconforming use.  The

3  city's action prescribes to stop you.  If the city doesn't

4  bring a lawsuit in court to stop you, you become a

5  nonconforming use by virtue of five years' operation.

6           How can it be that an illegal operator can

7  operate illegally for five years and become a legal

8  nonconforming use and the city can't stop them, but my client,

9  who is operating legally for six years, the city makes the law

10  more restrictive, then she can't become a nonconforming use?

11           The example I'm citing, the city attempted to

12  appoint a person to the Historic District Landmarks Commission.

13  He has three illegal STRs.  He is in Civil District Court right

14  now arguing, "I have a nonconforming use because the city's

15  action to stop me has prescribed."

16           It's absurd that you can operate illegally and

17  get a nonconforming use, but you operate legally and you are

18  penalized and you can't get one.  That just doesn't work.

19           **THE COURT:**  Counsel, I have heard it.  Thank you.

20           **MR. WASHINGTON:**  Thank you.

21           **THE COURT:**  First of all, when considering a motion

22  for a stay pending appeal, the Court employs -- as the parties,

23  I believe, have acknowledged -- a four-part test:  whether the

24  movant has made a showing of likelihood of success on the

25  merits; whether the movant has made a showing of irreparable

10:24

1   injury if the stay is not granted; whether the granting of a

2   stay would substantially harm the other parties; and whether

3   the granting of a stay would serve the public interest.  Fifth

4   Circuit law is also clear on that point along with various

5   opinions from the district courts about these various factors.

6           While there has been, since these motions were

7   filed, a notice of appeal filed by one set of plaintiffs, the

8   Hignell-Stark plaintiffs, I disagree with counsel's position

9   that that appeal is from a final judgment of this Court.  The

10  Court has not entered a final judgment.  We still have yet

11  unresolved issues.  I would not order a piecemeal consideration

12  of one set of issues because we still have substantial issues

13  remaining to be resolved mainly in the areas of relief issues

14  as well as attorneys' fees and costs.  Those are substantial

15  issues and would still be protected by rights of appeal from

16  those issues along with the findings of the Court on what I

17  will term liability issues or constitutional law determinations

18  that I have made in the particular case for various claims.

19          I disagree that there's a likelihood of success

20  on really any of the claims for the reasons I have already

21  given in my opinion, and we are not going to rehash or restate

22  what was already found in those opinions in that regards.  It

23  is not a question of whether or not my opinion is right or

24  wrong but whether or not there's a likelihood of success in

25  either granting a stay or a likelihood of success even on the

10:27

1    merits of the appeal.  Under both components, I disagree with

2    the plaintiffs' positions in that regard.

3              It's interesting to note that concerning the

4    duration argument and to what extent, if any, there's any

5    municipal authority to regulate the use of properties based

6    upon durations of use, what I found under Louisiana law,

7    without any restrictions really under federal law, that our

8    state constitution and enabling statutes, as cited in my

9    opinion, give the city and other municipalities in the state

10   the authority to regulate residential use of property based

11   upon duration of use as long as those regulations by municipal

12   authorities comply with federal and state laws.

13              In this particular case, the Court was faced

14   with various constitutional-based challenges to the city's

15   short-term rental (STR) codal and zoning provisions.  We found

16   some of those provisions to be constitutional and some not.

17              The more interesting argument, I believe, here

18   were those arguments based upon the constitutionality of the

19   prohibition of corporate entities being owners of a residential

20   property used for STR purposes in a residential area as well as

21   the restrictions against corporate operators of these

22   residential facilities.  There's no prohibition to corporate

23   entities operating an STR in the commercial areas designated by

24   the ordinances.  The restriction only applies to residential

25   areas.

10:30

1          Again, my opinion, which I have reread and

2     reflected upon in view of the motions presented here seeking a

3     relief or a stay, would not have a likelihood of success in

4     overturning those findings.  The reliance upon Texas law or

5     Texas cases interpreting their provisions on the durational

6     issue is inapplicable.  The unfettered allowance of corporate

7     entities operating in the STR context within residential

8     communities, for the reason I gave in my opinion, again

9     establishes the legality and constitutionality of those

10    restrictions.

11          I think, in terms of the other factors beyond

12    likelihood of success, which I found not to exist here, do not

13    need to be reached.  As an example of that, if I would have

14    found a likelihood of success on constitutional claims to be

15    present here, we would have naturally have found, because of

16    that, that there's a public interest, a public service here,

17    but I've not found the likelihood of success here to have been

18    shown.

19          To the extent that there's any prejudice upon

20    the city in granting the injunction, I find that particular

21    factor to be somewhat neutral in comparison to the impact upon

22    the movants here.  That's another reason why I'm not going into

23    a detailed review of the other factors because all factors have

24    to -- particularly the first factor, likelihood of success, to

25    me is the predominant factor, not necessarily exclusive but

10:34  1    still predominates over the others.

2              My opinion also addressed the nonconforming use

3    issue and Takings Clause issue and found that plaintiff

4    Marquardt had shown a nonconforming use of her property as an

5    STR.  She had consistently operated for years through being

6    granted a permit to operate her residential STR.  The record

7    might have shown some complaints on occasion from neighbors,

8    but it didn't prevent the city from giving her a permit for

9    each year that she was in operation.  There was a point in

10   time, because of litigation here and the Fifth Circuit and

11   changes in the ordinances, that led to the nonconforming use

12   finding in my opinion.

13             In that regard, the Court went and also found

14   there was an illegal taking for the reasons given in that

15   opinion, which again I don't need to restate are adopted

16   throughout here.

17             As I mentioned earlier, I considered in my

18   opinion the *Redfearn v. Creppel* case at 455 So.2d 1356.  The

19   Louisiana Supreme Court 1984 found that a legal nonconforming

20   use is designed to protect those users' uses which were

21   established before the enactment of a restrictive zoning

22   regulation.  See also the *Vieux Carre Property Owners v. City

23   of New Orleans* case, a Louisiana Fourth Circuit appellate

24   opinion from 2015, and *Craig v. City of New Orleans Board of

25   Zoning Adjustments*, again from the Fourth Circuit, from 2005.

10:37

 1                     As reiterated here today, "The purpose of zoning

 2       ordinances is to confine certain classes of buildings and uses

 3       to certain localities.  Because a nonconforming use is

 4       inconsistent with this objective, it should, consistently with

 5       the property rights of the individuals affected and substantial

 6       justice, be viewed narrowly and have all doubts resolved

 7       against continuation or expansion of the nonconformity,"

 8       quoting from the *Redfearn* decision from the Louisiana

 9       Supreme Court at page 1359.

10                     A party claiming a particular use as a

11       nonconforming use exception is subject to a narrow review by

12       the courts.  However, the Court should apply this scrutiny

13       consistent with the property rights of the individual affected

14       and substantial justice.  We read "individuals affected" to

15       include both the defendant and the plaintiff and "substantial

16       justice" to apply to all parties.

17                     Our opinion on the issue of not only the

18       determination of nonconforming use, the Takings Clause, as well

19       as the limitations arising from that finding, in my opinion,

20       was consistent with the property rights of the plaintiffs and

21       the interests of the defendant and consistent, in my opinion,

22       with the *Redfearn* opinion by the Louisiana Supreme Court.

23                     I don't ignore, however, that if in the

24       permitting process an applicant allegedly submitted material

25       false statements about their intentions to operate an STR, it

10:40

1    should not be ignored.  In my opinion, it leads to an unfair

2    result but not necessarily a violation of law that we have here

3    an applicant, Ms. Marquardt, who has already been acknowledged

4    without refute has operated her STR continuously for several

5    years through the permitting process but yet, because of the

6    lottery system, allegedly someone who submitted a false

7    application and won that lottery to operate an STR is now

8    depriving Ms. Marquardt of the opportunity to operate her STR.

9              She does, however, as I found in my opinion,

10   have the right to appeal that.  I do acknowledge the conditions

11   for appeal, the requirements of appeal have a difficult set of

12   criteria that she has to follow in order to get an exception to

13   having more than one STR in her block pursuant to the city

14   regulations, but I disagree with the plaintiffs, both

15   Hignell-Stark and Marquardt, that those difficulties are

16   somehow insurmountable.

17             As has already been pointed out here today in

18   oral argument, there are other available remedies at hand,

19   including getting support from local officials, district

20   councilmen in order to either expedite or at least perhaps

21   challenge and disqualify winners of lotteries who have no

22   intention of operating an STR and falsely state in their

23   applications that they do have those intentions.

24             I do agree with the city that it is difficult to

25   go into the intentions of what someone has on their mind when

10:43

1  they apply for the STR, but the evidence here as presented by

2  Marquardt, before my opinion as well as now, if that evidence

3  is correct, I find it difficult to believe that the city would

4  not act and consider a disqualification of that applicant who

5  won the lottery or alternatively granting an exception.

6          I read an interesting article from the *Harvard*

7  *Business Review* that made observations about residences that

8  are operated exclusively as short-term rentals have become

9  increasingly common.  That form of supply is most concerning,

10  according to their view, for the rental market because it has

11  the potential to remove a large share of the housing stock

12  devoted to long-term rentals.  It can also reshape the

13  composition of a local neighborhood, creating negative effects

14  such as the replacement of nurseries by restaurants and the

15  erosion of the historical neighborhood feel.

16          New Orleans and other cities in the

17  United States will continue to explore policies on how they

18  should best regulate short-term rentals.  The *Review* studied

19  the STR market and policies in places like New York City.  The

20  article's author suggested striking a balance so that travelers

21  and STR hosts gain without short-term rentals overwhelming

22  entire neighborhoods or significantly reducing the housing

23  units allocated to long-term renters.  It suggested that can be

24  accomplished, according to the authors, with limits rather than

25  outright bans of when and where housing units can be rented out

10:45

1   to travelers.  Limits on when units can be rented out on a

2   short-term basis can also, as we have seen, take the form of a

3   cap on the number of STRs within a certain locality.  I found

4   it interesting, too, that these caps vary by municipality.

5           I believe we all recognize that because

6   travelers mostly benefit from STRs in periods of peak demand,

7   allowing bookings of short-term rentals in those periods is

8   especially valuable.  At the same time, it allows occasional

9   hosts to take in extra earnings during periods of high demand

10  while making it much less profitable for investors to take

11  units away from long-term rentals.

12          Another example of the cap that sometimes occurs

13  in neighborhoods, as we have seen here but also in San Diego,

14  for instance, in their touristy Mission Beach neighborhood,

15  San Diego regulators imposed that no more than 30 percent of

16  housing units can operate in the short-term rental market.  In

17  other parts of San Diego, the limit is as low as 1 percent of

18  housing units related somewhat to current policies in

19  New Orleans.  These limits are imposed by requiring residents

20  to apply for licenses to operate in the short-term rental

21  market.

22          As we have already seen in this particular case,

23  the various forms of regulations can be difficult to enforce.

24  Most cities like New Orleans and maybe especially New Orleans

25  don't have the resources needed to investigate the permissions

of such short-term rentals.

The remedy may be made easier for regulators to monitor short-term rentals by requiring intermediary platforms like Arbnb and Vrbo to disclose the necessary information to city governments and directly enforce the regulation.  We have that here in our regulations.  Both platforms collect detailed information on each transaction and can remove properties that lack a valid permit or exceed the maximum number of nights.

Reflecting back upon that *Harvard Business Review*, it reported that it was unfortunate that cities like New York have sided with the hotels in banning short-term rentals altogether.  The review indicated that cities reap benefits of short-term rentals while avoiding harms.

I have no doubt that we have not seen the last ideation of short-term ordinances here within our city.  It is, in my opinion, a fluid situation not only in our city but in municipalities elsewhere, that regulators will continue to explore policies that hopefully promote fair and affordable housing especially for those who need it most.

There will be challenges and opportunities for everyone but only with a cautionary and reasonable approach that recognizes and effectively addresses any negative spillovers on renters and stakeholders in STRs.  I am particularly concerned about the information here of what could be an abuse of the process of people who allegedly falsely

10:51

1    misrepresent their intentions to operate an STR in their

2    applications and participation in the lottery.  I strongly

3    encourage, despite limited resources, that it will be in the

4    city's long-term best interest to investigate such claims and

5    take appropriate action.

6                    For those reasons and reasons given in my

7    opinion, the plaintiffs' motions are denied.  I will proceed

8    with relief measures because that's still an open issue.  Once

9    that issue is resolved, I will then enter a final judgment that

10   is appealable without leave needed from this Court to pursue

11   such an appeal from a final judgment.

12                    We will proceed to the next chapter.  I look

13   forward to further briefing from some parties on these relief

14   issues that I mentioned.  At that particular time, if

15   necessary, we will have an evidentiary hearing on relief issues

16   as well.

17                    I don't necessarily need an evidentiary hearing

18   with live testimony on attorneys' fees or cost issues.

19   Normally those can be resolved, at least on the evidentiary

20   issues, by the exhibits that will be attached either for or

21   against relief issues.  We certainly would have oral argument

22   on relief issues for attorneys' fees and costs.  We hold open

23   the possibility of having an evidentiary hearing on other

24   relief issues of a more substantial nature, like money damages,

25   etc., if applicable.

10:54

1             I remind everyone unless you have a need to

2   continue or seek an extension of a Court-ordered deadline, file

3   a timely request for that.

4             If nothing further, Court is adjourned.

5          **THE DEPUTY CLERK:**  All rise.

6          (Proceedings adjourned.)

7                     * * *

8                  **CERTIFICATE**

9             I, Toni Doyle Tusa, CCR, FCRR, Official Court

10  Reporter for the United States District Court, Eastern District

11  of Louisiana, certify that the foregoing is a true and correct

12  transcript, to the best of my ability and understanding, from

13  the record of proceedings in the above-entitled matter.

14

15

16                       */s/ Toni Doyle Tusa*

17                       Toni Doyle Tusa, CCR, FCRR
                             Official Court Reporter

18

19

20

21

22

23

24

25